PEOPLES NATURAL GAS DIVISION OF NORTHERN NATURAL GAS COMPANY, a corporation, Plaintiff-Appellee,

v.

PUBLIC UTILITIES COMMISSION OF the STATE OF COLORADO, and Edwin R. Lundborg, Edyth S. Miller and Sanders G. Arnold, individual commissioners, Defendants-Appellants,

and

Farmers Association for Rate Maintenance, Intervenor-Appellant.

No. 83SA269.

Supreme Court of Colorado, En Banc.

April 15, 1985.

T.N. Wright, M.E. Remmenga, Omaha, Neb., Gresham, Stifler & Travis, Thomas C. Stifler, Colorado Springs, for plaintiff-appellee.

Duane Woodard, Atty. Gen., Charles B. Howe, Deputy Atty. Gen., Richard H. Forman, Sol. Gen., John E. Archibold, Asst. Atty. Gen., Denver, for defendants-appellants.

Gibson, Dunn & Crutcher, Craig R. Carver, David Schieferstein, Denver, for intervenor-appellant.

LOHR, Justice.

The Public Utilities Commission of the State of Colorado (PUC) and the Farmers Association for Rate Maintenance (FARM), a group representing certain farmers in Baca and Prowers Counties in southeastern Colorado, appeal a district court judgment reversing the PUC's award of reparations to irrigation ratepayers of Peoples Natural Gas Division of Northern Natural Gas Company (Peoples) in those counties.[1] The district court concluded that, because no complaints were filed with the PUC by the aggrieved ratepayers, the PUC lacked authority to award reparations as a remedy for overbillings by Peoples. *See* § 40–6–119, 17 C.R.S. (1984). The district court also concluded that the evidence did not support the reparations award. We hold that section 40–6–119 does not preclude the PUC from initiating an investigation and awarding reparations at its own instance. However, because the PUC's findings concerning the temporal and geographical extent of the gas pressure problems that resulted in overbillings to Peoples' customers are fatally inconsistent, the district court's judgment reversing the PUC decision must be affirmed.[2] The case must be remanded to the PUC for resolution of the inconsistencies in its findings and entry of

a decision consistent with such revised findings as it may adopt.

I.

We summarize the procedural history of this matter and the facts as found by the PUC. Peoples is a public utility engaged in the purchase, transmission, distribution and sale of natural gas in certain parts of Colorado, including Baca and Prowers Counties in the southeastern part of the state. With respect to those activities, Peoples is subject to the jurisdiction of the PUC.

One of the uses for natural gas in Baca and Prowers Counties is to fuel internal combustion engines that are used as power sources for irrigation well pumps. A separate classification has been established for irrigation customers in determining the just and reasonable rates to be charged by Peoples for its natural gas service. Peoples serves more than 600 customers in this classification in Baca and Prowers Counties. Service to irrigation users constitutes Peoples' largest customer load in the two counties and causes a summer peak demand for natural gas in the area.

Certain irrigation customers of Peoples began experiencing difficulties with their gas supplies from Peoples in 1973 or 1974. A number of these persons appeared and testified at a PUC hearing in Springfield, Colorado, on March 20, 1975, held in connection with a proposed rate increase schedule filed by Peoples. As a result of that hearing, the PUC issued the following order:

> Peoples Natural Gas Division of Northern Natural Gas Company shall immediately start to formulate a plan to eliminate gas pressure problems [in] its southeast rate area, and shall within ninety (90) days from the effective date of this Order file said plan with this Commis-

---

1. This court has appellate jurisdiction in this case under section 40–6–115(5), 17 C.R.S. (1984).

2. As noted herein, the PUC properly awarded reparations to twenty-four customers because they had received and paid for natural gas of a

lower BTU value than Peoples was required to deliver. The inconsistent findings do not affect this award, so the district court's judgment must be reversed and the PUC reparation award reinstated as it relates to that matter.

sion, and shall thereafter keep this Commission advised of the progress being made on implementing said plan and shall advise this Commission whether or not said plan is effective in eliminating the problem, and shall advise this Commission when the plan has been completed and the problem is eliminated.

In response, Peoples formulated a plan, filed it with the PUC, and began implementing it. Further organized complaint concerning the system was not heard until September 29, 1977, in Lamar, Colorado, at a hearing in connection with another proposed rate increase schedule filed by Peoples. The complaints from Peoples' customers prompted a staff investigation by the PUC. As a result of information gained from that investigation, on October 25, 1977, the PUC issued to Peoples an order to show cause, initiating the present proceedings.

The show cause order alleged that Peoples had engaged in practices that may have violated the statutes and regulations under which the PUC regulates the rates charged and services provided by public utilities. *See* §§ 40–3–101 to –113, 17 C.R.S. (1984). The order outlined the questioned practices and required that Peoples show cause why the PUC should not enter a further order, as follows:

a. Requiring Respondent [Peoples] to cease and desist from supplying gas which is not substantially free of impurities;

b. Requiring Respondent to supply gas which is not below the heating value which is on file with the Commission as part of Respondent's schedule of rates;

c. Requiring Respondent to cease and desist from supplying gas below the normal pressure of gas which Respondent has proposed to maintain, pursuant to its tariffs[,] and requiring Respondent to maintain a pressure base equal to or above that upon which its billings to customers are made.

d. Requiring Respondent to make appropriate reparations to customers who have been charged for gas not received

in an amount and in a manner to be determined by the Commission.

FARM filed a petition to intervene in the proceeding on December 8, 1977, and the PUC allowed intervention. In the petition, FARM stated that it was composed of most of the irrigation farmers operating within Baca and Prowers Counties. All members of FARM were alleged to be customers of Peoples.

Hearings were held before a PUC hearings examiner in January, February and April of 1978. Testimony, exhibits and position statements were presented on behalf of Peoples, FARM, and the PUC staff. On October 23, 1978, the hearings examiner issued a recommended decision. The examiner found that impurities, including water, oil (possibly compressor oil), drip gas, sand, dust, rust, alkali, welded metal and salt, had been found in the gas supplied by Peoples in certain specified areas in southeastern Colorado. These impurities had been introduced into the system before the gas reached the customers' sides of the meters. The contaminants had damaged motors and, through the freezing of liquids, had plugged lines. The examiner also found that as many as twenty-four of Peoples' customers in the Stonington-Walsh area had received gas below the 900 BTU level required in Peoples' schedule of rates and service, due primarily to the use by Peoples of two inferior sources of supply. Peoples had since discontinued using one of those sources of supply.

The examiner next found that Peoples' customers in the Holly, Two Buttes and Walsh areas began experiencing low pressure problems in 1973, and that the problems spread to the Stonington, Vilas and Springfield areas by 1975. The examiner then found:

After 1975, however, this problem subsided as a result of the improvements made by Peoples to the system. Some problems still occurred in 1976, but the evidence in this proceeding shows few instances after 1976. Some of the instances of low pressure problems in 1977 [were] characterized as not too signifi-

cant by the witnesses experiencing them. For instance, one witness indicated that he had a "little" problem in 1977, and that a new line installed by Peoples had cured it. This was after a more widespread shortage had occurred during the Spring for a short period of time.

The examiner noted that low gas pressures can damage the internal combustion engines used by the irrigators. When the pressure is low enough, the engines will not run at all. Besides the operational problems, the examiner also found that the low pressure problem resulted in billing errors by Peoples.

Peoples['] gas rates are based on certain standard conditions, including a standard gas pressure. The meters that are used to measure a customer[']s usage of natural gas are most accurate at this test proven standard pressure. The amount of compression or expansion in natural gas, and therefore the true quantity of gas, depends upon the pressure put upon it. The actual delivery pressure must be known to produce an accurate bill for the customer.

\* \* \* \* \* \*

Peoples['] standard procedure is to take a pressure reading at the time the meter is read if gas is flowing through the meter. This pressure is then used to calculate the months [sic] bill. If gas is not flowing through the meter, a pressure is not taken, and the bill is calculated on the basis of the last pressure reading that was taken. This is a standard practice in the natural gas industry and is generally fair to both the consumer and the company if, and only if, adequate system pressures are maintained. However, this method can result in overbilling and unfairness to the customer if the pressure that is read at meter reading time happens to be higher than the average pressures experienced during the

rest of the month. Underbilling and unfairness to the company will result if the average pressure actually delivered happens to be higher than the pressure taken at meter reading time.

The evidence in this proceeding establishes that average delivery pressures during the month have in fact been lower than pressures taken at meter reading times resulting in overbilling to customers. The evidence does not show any instances of underbilling, but it is reasonable to conclude that this may have occurred. The evidence does establish that the chances of overbilling are far greater than the chances of underbilling, and, in fact, the chances of underbilling are minuscule.

The examiner found that the billing errors began with the pressure problems in 1973, and that "[t]he evidence establishes that it was still occurring in 1977, but on a reduced scale." The examiner concluded, however, that there was no evidence to show the extent of overbilling to specific customers. Therefore, the evidence failed to establish any basis upon which reparations could be ordered.

The examiner then noted that Peoples was spending approximately $2.3 million on improvements and modifications to solve each of the problems described above, and that these improvements went beyond what was ordered in the 1975 directive from the PUC. The examiner concluded that the "totality of these steps" should eliminate the existing problems. Because the evidence showed that Peoples had gone beyond what was ordered by the PUC in 1975 in an effort to eliminate the problems, the examiner rejected FARM's request that Peoples' rate of return for the southeast rate area be lowered in response to the gas supply problems.[3] Finally, the examiner concluded that FARM was not entitled to an award of attorneys' fees under the guidelines established by the PUC, as

---

**3.** Part of every public utility rate case is the determination by the PUC of the proper rate of return on capital investment that the utility must be allowed to recover in revenues. The utility's capital investment is also known as its rate base, i.e., the property dedicated to providing service to the utility's customers. *See Colorado Municipal League v. PUC,* 687 P.2d 416, 418 (Colo.1984).

FARM did not represent "the interests of the general ratepayers of Peoples."

Based on his findings and conclusions, the examiner recommended that the PUC require Peoples to cease and desist from supplying natural gas below the minimum BTU level specified in Peoples' schedule of rates and service, supplying natural gas containing substantial contaminants, and supplying natural gas at pressures that do not allow accurate billing and proper operation of appliances. The examiner recommended as affirmative relief that Peoples be ordered to continue with the construction projects and the supply acquisition efforts planned to correct the recognized problems, initiate rigorous monitoring and customer relations programs, and prove compliance with the cease and desist order in every future rate proceeding concerning the southeast Colorado area.

FARM filed exceptions to the recommended decision before the PUC, seeking modification of that decision to include reparations, a reduced rate of return for Peoples' southeast Colorado rate area and an award of attorneys' fees for FARM. On December 21, 1978, the PUC issued decision No. C78–1684, generally adopting the examiner's recommended decision but with modifications ordering Peoples to pay reparations and ordering further proceedings to determine whether FARM was entitled to attorneys' fees.

Concerning reparations, the PUC agreed with the examiner that the record did not provide a basis to evaluate precisely the extent of the overbilling due to the low pressure problems. However, the PUC concluded that the record provided sufficient evidence to establish a reasonable, conservative estimate of overbilling throughout the entire system and that the estimate could form the basis for an order of reparations. The PUC first stated that "all of Peoples' irrigation customers have received their gas at low pressures since at least 1973 and through 1977." This finding appears to be contrary to the examiner's finding, quoted above and adopted without change by the PUC, that low pressure problems subsided after 1975 and that few instances of low pressure occurred in 1977. Next, the PUC noted that Peoples was ordered by the PUC to correct low pressure problems in 1975, but was not ordered to pay reparations. As Peoples had relied on that order, the PUC determined that it would consider reparations for overbilling due to only those pressure problems occurring between September 2, 1975, the date of termination of the proceedings in which Peoples was directed to correct the pressure deficiencies, and October 25, 1977, the date the present proceedings commenced.

The PUC then reviewed the specific evidence of pressure discrepancies testified to by certain of Peoples' customers and concluded that the median overbilling throughout the system between September 2, 1975, and October 25, 1977, "was at least 15%." Peoples was ordered to pay to all irrigation customers within its southeast Colorado rate area reparations of 15% of all payments made for gas supplied during that period, plus interest at 7% per year. In addition, Peoples was ordered to pay reparations to twenty-four customers in the Stonington-Walsh area because in 1977 Peoples supplied these customers with gas below the required 900 BTU level.

Peoples filed an application for reconsideration[4] with the PUC. Further proceedings were held in abeyance for more than two years while Peoples unsuccessfully sought to subpoena an assistant solicitor general, who was representing the PUC staff in these proceedings, regarding alleged ex parte communications between her and the PUC. See *Peoples Natural Gas Division of Northern Natural Gas Co. v. PUC*, 626 P.2d 159 (Colo.1981).

---

4. Any party is authorized to "make application for rehearing, reargument, or reconsideration" directed to any decision of the PUC. § 40–6–114(1), 17 C.R.S. (1984). For brevity, we refer to such applications as applications for rehearing or applications for reconsideration, although the parties typically style them fully as applications for rehearing, reargument or reconsideration.

On December 22, 1981, the PUC issued decision No. C81–2098, reaffirming its order of reparations. The PUC added to the earlier findings a statement that the evidence established a basis for reparations "due to not only reduced pressure (which relates to quantity), but also because of contaminants (which relates to quality)." However, the PUC stated that because the evidence indicated that the problems with respect to low pressure and contaminants occurred "almost exclusively, if not totally, in the Walsh, Two Buttes, Holly, Vilas, and Springfield areas," reparations would be paid only to customers within those areas, more specifically described as "that area east of the eastern edge of Range 43 West of the 6th P.M. in Prowers County and east of the eastern edge of Range 48 West of the 6th P.M. in Baca County." The PUC modified another statement to say that "certain" irrigation customers of Peoples, not "all" irrigation customers, received gas at low pressures beginning in 1973 or 1974.

In the amended findings and orders discussing the award of reparations, the PUC deleted the specific rate of interest to be applied to the reparations. Finally, the PUC concluded that FARM advanced "general consumer interests" and represented a broad class of consumers in Baca and Prowers Counties. The PUC ordered Peoples to pay FARM a sum for attorneys' fees.

Both FARM and Peoples filed applications for reconsideration. On February 4, 1982, the PUC issued its third order, decision No. C82–177, modifying the December 1981 order in three respects. First, the PUC slightly modified the description of the customer area in which reparations must be paid, finding that the earlier decision had excluded certain irrigation customers harmed by low pressure problems.[5] Second, the PUC stated that the omission of the specific rate of interest in the earlier order was a clerical error, and that the "Commission intended, and at its open meeting in which the matter was discussed, ordered that the current interest rate on deposits be used as the applicable rate of interest." The PUC determined that the current interest rate on deposits was 13.21% and ordered that 13.21% per year interest be added to all payments of reparations. Finally, the PUC deleted the requirement that Peoples present evidence regarding compliance with the particulars of the cease and desist order in future rate proceedings.[6]

Peoples filed a further application for reconsideration, which the PUC denied. Peoples then sought review in El Paso County District Court pursuant to section 40–6–115(1), 17 C.R.S. (1984), and C.R.C.P. 106(a)(4). The district court reviewed the record from the PUC, considered briefs and oral argument presented by the parties, and issued a judgment on May 10, 1983. The court concluded that the PUC did not have the statutory authority to award reparations to customers in this case, as no customer had filed a written complaint with the PUC seeking reparations pursuant to section 40–6–119, 17 C.R.S. (1984). Furthermore, the district court held that evidence in the record did not support the PUC's award of reparations resulting from the low pressure problems, even assuming the PUC had the necessary authority. The

---

5. In its findings, the district court noted that "[t]he over-all effect of both orders was to delete some 80 from the 600 plus irrigation customers."

6. Peoples noted in its application for reconsideration that four rate hearings concerning Peoples' southeast Colorado rate area had transpired since the date of the examiner's recommended decision on October 23, 1978. In each case, Peoples presented evidence of compliance with the proposed cease and desist order. Peoples argued that there was no reason to require

Peoples to present evidence of compliance in further proceedings, that the expense of proving compliance was burdensome and would be borne by the ratepayers and that neither FARM nor the Attorney General's office had objected to deletion of this portion of the cease and desist order. In its amended order, the PUC stated that it agreed with Peoples that there was no longer any reason for Peoples to be required to present evidence of compliance with the cease and desist order in further rate proceedings.

court affirmed all other findings and orders of the PUC.

▇▇▇ The PUC and FARM then brought this appeal.[7] The issues presented for review are whether the PUC had the authority to award reparations in absence of a written complaint by Peoples' customers, whether the award was supported by the evidence, and, in the event reparations were properly ordered, whether the PUC was empowered to increase the rate of interest on reparations payments on reconsideration when no party requested that relief. We address the issues in that sequence.

## II.

▇▇▇ Peoples contends that the PUC lacks statutory authority to award reparations in this case. This view is based on its interpretation of section 40–6–119, 17 C.R.S. (1984):

(1) When complaint has been made to the commission concerning any rate, fare, toll, rental, or charge for any product or commodity furnished or service performed by any public utility and the commission has found, after investigation, that the public utility has charged an excessive or discriminatory amount for such product, commodity, or service, the commission may order that the public utility make due reparation to the complainant therefor, with interest from the date of collection, provided no discrimination will result from such reparation. (2) If the public utility does not comply with the order for the payment of reparation within the specified time in such order, suit may be instituted in any court of competent jurisdiction to recover the same. All complaints concerning excessive or discriminatory charges shall be filed with the commission within two years from the time the cause of action accrues, and the petition for the enforcement of the order shall be filed in the court within one year from the date of the order of the commission. The remedy provided in this section shall be cumulative and in addition to any other remedy in articles 1 to 7 of this title provided in case of failure of a public utility to obey the order or decision of the commission.

Peoples takes the position that unless each individual overbilled customer seeking reparations makes a written complaint to the PUC within two years from the time such customer's cause of action arises, the PUC has no power to award reparations to rectify the overbilling. We disagree.

Section 40–6–119 concerns complaints made "to the commission." The PUC, however, is empowered to hear complaints made both *to* the PUC and *by* the PUC, i.e., complaints on its own motion.

---

7. Peoples moved to dismiss this appellate proceeding on the basis that the PUC and FARM failed to perfect their appeals because they did not file a motion for new trial in the district court pursuant to C.R.C.P. 59(f) after the district court entered judgment against them. Prior to a revision of the Colorado Rules of Civil Procedure effective January 1, 1985, C.R.C.P. 59(f) provided that only questions presented in a required motion for new trial would be considered by the appellate court. However, C.R.C.P. 59(h), prior to revision, further provided that when final judgment is entered "after any hearing not involving controverted issues of fact," a motion for new trial is not a prerequisite to appeal. In reviewing a decision of the PUC, the district court reviews only the record created before the PUC and, except where a constitutional question is raised, the district court is not a finder of fact. § 40–6–115(1)–(3), 17 C.R.S. (1984). Rather, the district court performs the same function as an appellate court. The findings of fact by the PUC are conclusive upon the district court when supported by competent evidence. *Id.; Colorado Municipal League v. PUC,* 687 P.2d 416, 419 (Colo.1984); *Pollard Contracting Co., Inc. v. PUC,* 644 P.2d 7, 11 (Colo.1982). Since no constitutional question was presented to the trial court here, the scope of review by the district court did not extend to resolving controverted issues of fact. Pursuant to C.R.C.P. 59(h), there was no need for the PUC or FARM to file a motion for new trial in the district court in order to perfect an appeal in this court. *Cf. Colorado Civil Rights Commission v. State by and through School District No. 1,* 30 Colo.App. 10, 14–15, 488 P.2d 83, 85 (1971) (It is unnecessary to file a motion for new trial in order to appeal from a district court judgment reviewing a Colorado Civil Rights Commission decision where the district court performs only an appellate function.).

Complaint may be made by the commission on its own motion or by any corporation, person, chamber of commerce, or board of trade, or by any civic, commercial, mercantile, traffic, agricultural, or manufacturing association or organization, or by any body politic or municipal corporation by petition or complaint in writing, setting forth any act or thing done or omitted to be done by any public utility, including any rule, regulation, or charge heretofore established or fixed by or for any public utility, in violation, or claimed to be in violation, of any provision of law or of any order or rule of the commission.

§ 40–6–108(1)(a), 17 C.R.S. (1984).

▉▉ Two statutes concerning the same subject are to be read together to the extent possible so as to give effect to legislative intent. *Buck v. District Court,* 199 Colo. 344, 347, 608 P.2d 350, 352 (1980); *People in the Interest of M.K.A.,* 182 Colo. 172, 175, 511 P.2d 477, 479 (1973). Section 40–6–119 contains no reference to complaints *by* the PUC on its own motion. When considered together with section 40–6–108(1)(a), which clearly recognizes that complaints by the PUC are contemplated for some purposes, we believe that section 40–6–119 reflects the legislative intent to confine its applicability to complaints initiated by others. This view is reinforced by the provision in section 40–6–119 that any reparation award be made "to the complainant," a direction that is inconsistent with a construction that the PUC may be a complainant under that section. Therefore, we hold that section 40–6–119, including its two year statute of limitations for filing complaints, is not applicable to complaints by the PUC on its own motion.

▉▉ This does not mean that the PUC lacks authority to investigate excessive charges and award reparations on its own motion. Section 40–3–102, 17 C.R.S. (1984), invests the PUC with the power and duty to "prevent unjust discriminations and extortions" in rates and charges and to "do all things, whether specifically designated in articles 1 to 7 of this title or in addition

thereto, which are necessary or convenient in the exercise of such power. . . ." Ordering reparations after complaint on its own motion is within this broad grant of power to the PUC, not otherwise restricted by statutory enactment, as long as the order is just and reasonable and in accordance with the evidence. *See Mountain States Telephone and Telegraph Co. v. PUC,* 195 Colo. 130, 134–36, 576 P.2d 544, 546–48 (1978); § 40–6–115(3), 17 C.R.S. (1984). Otherwise there would be no effective remedy for pervasive overcharging of a utility's ratepayers, many of whom might have difficulty in detecting and proving the overcharge, and might have only a small amount to recover. *Cf. Mountain States Telephone & Telegraph Co. v. PUC,* 180 Colo. 74, 502 P.2d 945 (1972) (affirming refund to Mountain Bell customers after rate proceeding).

▉▉ Derived as it is from section 40–3–102, the PUC's power to initiate its own investigations into excessive charges and to make reparation awards is not subject to the two year statute of limitations in section 40–6–119. That limitation period serves an important purpose, however, even though not applicable to the PUC, for only if a ratepayer files a complaint within the period prescribed by section 40–6–119 can that complainant be assured of an investigation of the matter by the PUC. Thereafter, initiation of any investigation and award of reparations is committed entirely to the sound discretion of the PUC.

We conclude that the PUC has not exceeded its statutory authority by awarding reparations to Peoples' customers for overbilling following complaint on its own motion.

### III.

▉▉ Having decided that the PUC had the statutory authority to award reparations in this case, we must review the district court's alternative holding that the evidence in the record did not support the specific award of reparations made by the PUC.

■ The district court's review of a PUC decision

shall not extend further than to determine whether the commission has regularly pursued its authority, including a determination of whether the decision under review violates any right of the petitioner under the constitution of the United States or of the state of Colorado, and whether the decision of the commission is just and reasonable and whether its conclusions are in accordance with the evidence.

§ 40-6-115(3), 17 C.R.S. (1984). When there is competent evidence in the record to support findings of fact by the PUC, a reviewing court may not substitute its judgment for that of the PUC. *Colorado Municipal League v. PUC*, 687 P.2d 416, 419 (Colo.1984); *Pollard Contracting Co., Inc. v. PUC*, 644 P.2d 7, 11 (Colo.1982). Deference to the PUC's findings, however, presupposes that these findings are internally consistent. That is not the case here.

When discussing the possibility of reparations resulting from overbilling by Peoples, the PUC noted that "certain of Peoples' irrigation customers have received their gas at low pressures since at least 1973 and through 1977." After a summary review of testimony from farmers concerning pressure problems, and reference to testimony by four farmers about specifically quantified pressure discrepancies, the PUC awarded reparations to all irrigation ratepayers who were customers of Peoples residing within a large but specifically defined geographical area covering portions of Baca and Prowers Counties. The reparations were to be 15% of *all* payments made by these customers between September 2, 1975, and October 25, 1977. Implicit within these reparation awards is a finding by the PUC that the low pressure problems suffered were widespread within this geographical area and continual throughout this time period.

■ If we accept for the moment that widespread pressure problems did occur throughout the relevant 1975–1977 time period, the PUC's award of reparations may reflect a reasonable inference by the PUC of the average overcharges suffered by Peoples' customers. It is peculiarly within the province of the PUC to choose among the conflicting inferences to be drawn from the evidence and fashion the necessary relief, especially in cases posing evidentiary questions addressed to the expertise and judgment of the PUC and its staff. *E.g., Morey v. PUC*, 629 P.2d 1061, 1068 (Colo. 1981).

However, the PUC's own findings conflict with the implicit threshold finding of widespread low pressure problems necessary to support the award. In an earlier part of its decision, the PUC discussed whether low pressure problems in fact occurred. The PUC found:

Peoples and certain of its customers in the Southeast Rate Area began experiencing low pressure problems as early as 1973. The problems were occurring in the Holly, Two Buttes and Walsh areas. The problem of low pressure intensified after 1973. It was noted by irrigation farmers because they would in effect run out of gas and their engines would slow down or even quit. The low pressure problems occurred again in 1974 and 1975. The evidence in this proceeding shows that the low pressure problems that resulted in irrigation engines failing to run, existed not only in the Holly, Two Buttes, and Walsh areas, but that it had also spread to include the Stonington, Vilas, and Springfield areas by 1975. As a result of the Order which was entered in Investigation and Suspension Docket No. 917, and which was mentioned above, Peoples made substantial improvements to its Southeast System.

After 1975, however, this problem subsided as a result of the improvements made by Peoples to the system. Some problems still occurred in 1976, but the evidence in this proceeding shows few instances after 1976. Some of the instances of low pressure problems in 1977 were characterized as not too significant by the witnesses experiencing them. For instance, one witness indicated that he

had a "little" problem in 1977, and that a new line installed by Peoples had cured it. This was after a more widespread shortage had occurred during the Spring for a short period of time.

Coming on the heels of this finding, the award of reparations to all of Peoples' customers for overbilling caused primarily by low pressure problems [8] throughout a widespread geographical area and uniformly calculated for an entire time period from 1975 to 1977 cannot be justified. The PUC's findings as a whole are internally inconsistent.

■ Because the PUC's findings are fatally inconsistent, we cannot perform even our limited review function of determining whether competent evidence in the record supports the findings of the PUC and whether the PUC regularly pursued its authority and entered a just and reasonable decision.[9] The PUC's reparation award order is not justified by the findings and is arbitrary and capricious. Orders of the PUC that are arbitrary and capricious must be set aside. *Colorado Municipal League v. PUC*, 687 P.2d at 418–19; *City of Montrose v. PUC*, 197 Colo. 119, 121, 590 P.2d 502, 504 (1979).

The district court's vacation of the award of reparations for overbilling due to low pressure and contaminant problems must be affirmed, although for reasons other than expressed by the district court. The case must be remanded to the PUC for resolution of the inconsistencies in its findings and entry of a decision consistent with such revised findings as it may adopt. *See Caldwell v. PUC*, 200 Colo. 134, 613 P.2d 328 (1980); *Haney v. PUC*, 194 Colo. 481, 574 P.2d 863 (1978).

■ The PUC also awarded reparations to twenty-four named customers of Peoples in the Stonington-Walsh area because Peoples supplied gas below the required BTU level to these customers. This award was not specifically challenged in Peoples' petition for reconsideration of the PUC order. Furthermore, competent evidence in the record supports this determination. The district court did not disagree, but vacated this award on the grounds that the PUC did not have the statutory authority to award these reparations in the absence of a written complaint by each of the customers. For reasons stated in Part II of this opinion, we reverse, and hold that the PUC's reparations award to the twenty-four customers who received low energy gas must be reinstated and affirmed.

## IV.

■ The final issue in this case concerns the PUC's award of interest on the reparations.[10] In its December 21, 1978,

8. In its findings, the PUC stated that the evidence supported an award of reparations "due to not only reduced pressure (which relates to quantity), but also because of contaminants (which relates to quality)." However, the detailed review of the evidence that followed, and which resulted in the imposition of the 15% reparation award, focused solely on the low pressure problems experienced by the farmers. If the PUC intends the specific reparation award amount to reflect a factor concerning the contaminant problem—and, thus, bolster the support in the findings for the reparation award in response to the problems noted in this opinion—the PUC must make findings explaining how the contaminant factor influences the calculation of the reparation award if the award is to be other than arbitrary in that respect.

9. A possible way of interpreting the PUC's findings in an effort to explain away the inconsistency noted is that *operational difficulties* resulting from reduced pressure subsided after 1975, but *overbilling* due to less severe reduced pressures continued on a widespread scale through 1977. The findings themselves, however, do not make this clear distinction. And even assuming that this interpretation is what the PUC intended, the findings still are inadequate to explain the temporal and geographical extent of the overbilling attributable to low pressure problems.

10. The district court did not address the propriety of the PUC's change of the interest rate on reparations because the court ruled that no reparations could be awarded. We address the interest rate issue because it is relevant to the correct reparations award to the twenty-four customers who received low energy gas. Moreover, it may arise in further proceedings before the PUC with respect to reparations based on low pressure deliveries. The issue has been fully briefed and argued.

decision, interest of 7% per year from the dates of overbilling was awarded by the PUC. FARM did not apply for rehearing. Peoples filed an application for rehearing but did not contest the rate of interest set by the PUC. Following the appeal to this court on the question whether Peoples could depose the assistant solicitor general, the PUC issued a decision on rehearing on December 22, 1981. The rate of interest was not specified in this decision. Rather, where the 1978 decision had awarded interest "at 7% per annum," the 1981 decision awarded interest only "at per annum." Both FARM and Peoples applied for rehearing. FARM pointed out the apparent clerical error, while Peoples argued that the original rate of interest had to be retained. In response, the PUC amended its decision to award interest on the reparations at the rate of 13.21%.

In its findings, the PUC explained:

The Commission intended, and at its open meeting in which the matter was discussed, ordered that the current interest rate on deposits be used as the applicable rate of interest. The current interest rate on deposits is 13.21%, and that is the percentage rate which shall be used.

\* \* \* \* \* \*

Initially the interest rate ordered was 7 percent per annum from the dates of the alleged overbillings. However, as indicated above, we believe the interest rate should be the current interest rate on deposits which is 13.21%. Otherwise, Peoples' customers would not be fully and fairly compensated for the loss of use of their money. The rate of interest, of course, should reflect the current cost of money, not one which is several years out of date.

The PUC rejected Peoples' argument that the PUC was limited on rehearing to considering only those issues raised in Peoples' original application for rehearing. Peoples raised the same objection in a further application for reconsideration, which the PUC denied without comment. The district court did not reach the issue of the interest

to be paid on reparations because it overturned the entire reparations award.

Peoples does not challenge the specific interest rate selected by the PUC. Peoples only argues that the PUC had no authority to alter the interest rate when no party raised that issue in an application for rehearing. Both the PUC and FARM assert that the PUC is not limited on rehearing to addressing only the issues raised in applications for rehearing. We agree that the PUC is not so limited.

Section 40-6-114(3), 17 C.R.S. (1984), provides:

If after rehearing, reargument, or reconsideration of a decision of the commission it appears that the original decision is *in any respect* unjust or unwarranted, the commission may reverse, change, or modify the same accordingly. Any decision made after rehearing, reargument, or reconsideration, reversing, changing, or modifying the original decision, shall be subject to the same provisions with respect to rehearing, reargument, or reconsideration as an original decision. (Emphasis added.)

The language of the statute is plain—the original decision may be modified if it appears that it was in any respect unjust or unwarranted. Here, the PUC found that the original decision was unjust as to the selection of the interest rate to be added to the reparations, and modified the decision. The modified decision was subject to reconsideration, *see* § 40-6-114(1), (3), 17 C.R.S. (1984), and Peoples did apply for reconsideration. This application gave Peoples an opportunity to be heard regarding whether the original decision was indeed unjust or unwarranted.

Peoples refers to dictum in *PUC v. Northwest Water Corp.*, 168 Colo. 154, 167, 451 P.2d 266, 272 (1969), to the effect that an application for rehearing is "comparable" to a motion for new trial, and notes that, prior to the revision of C.R.C.P. 59, effective January 1, 1985, errors not specified in a motion for new trial could not be considered on review. *See* C.R.C.P. 59(f), prior to the 1985 amendment, as found in

7A C.R.S. (1973). However, whether or not the Colorado Rules of Civil Procedure generally apply in administrative proceedings, the rules clearly are not applicable when inconsistent or in conflict with the procedure and practice provided for special statutory proceedings, as here. C.R.C.P. 81(a). We conclude that the PUC's modification of the rate of interest on rehearing, based on its conclusion that the original decision was unjust in this respect, was within the PUC's statutory authority and was not arbitrary, capricious or otherwise improper.

## V.

In conclusion, we reverse the holding of the district court that the PUC lacked the necessary statutory authority to award reparations to customers of Peoples for excessive charges by Peoples. We affirm the district court's determination that the award of reparations resulting from low pressure problems was improper, although for reasons not expressed by the district court. We hold that the PUC's findings on this issue will not support an award of reparations because they are internally inconsistent. On remand, the PUC must resolve the inconsistencies in its findings concerning the geographical and temporal extent of the problems suffered by Peoples' customers due to low gas pressures. It must then enter a decision consistent with its revised findings. We also hold that the PUC properly awarded reparations to customers who suffered from excessive charges for gas that had less than the required heating value. Finally, we hold that the PUC was empowered to modify on rehearing the rate of interest to be paid on any reparations awarded.

The judgment is affirmed in part and reversed in part. The case is remanded to the district court with directions to affirm that part of the PUC's decision awarding reparations to twenty-four customers of Peoples based on low BTU value of natural gas supplied, and to remand to the PUC for resolution of the conflicts in its findings concerning the pressure problems and for

entry of a decision consistent with that resolution.

ROVIRA, J., concurs in part, specially concurs in part, and dissents in part.

ROVIRA, Justice, concurring in part, specially concurring in part, and dissenting in part:

I specially concur in the majority's holding in Part II of the opinion that the Public Utilities Commission (PUC) has power to order reparations in cases in which the PUC initiated the complaint on its own motion. However, I dissent to that portion of Part II which holds that in such cases the PUC is not limited to the two-year statute of limitations set out in section 40–6–119(2), 17 C.R.S. (1984). I also dissent to the portion of Part IV which concludes that the PUC had authority to modify the reparation interest rate to 13.21%. I concur in the remainder of the opinion.

The majority holds that the PUC has power to order reparations in a case in which the PUC initiated the complaint on its own motion and that this power is derived from section 40–3–102, 17 C.R.S. (1984). However, it has failed to carefully analyze what authority is delegated in section 40–3–102. Such an analysis will demonstrate that the majority's reading of that section is too broad.

Section 40–3–102 provides:

The power and authority is hereby vested in the public utilities commission of the state of Colorado and it is hereby made its duty to adopt all necessary rates, charges, and regulations to govern and regulate all rates, charges, and tariffs of every public utility of this state to correct abuses; to prevent unjust discriminations and extortions in the rates, charges, and tariffs of such public utilities of this state; to generally supervise and regulate every public utility in this state; and to do all things, whether specifically designated in articles 1 to 7 of this title or in addition thereto, which are necessary or convenient in the exercise of such power, and to enforce the same by the penalties provided in said articles

through proper courts having jurisdiction. . . .

The majority reads the portion of this section which authorizes the PUC "to do all things, whether specifically designated in articles 1 to 7 of this title or in addition thereto, which are necessary or convenient in the exercise of such power" as a grant of power to order reparation in cases in which the PUC initiated a complaint. However, the language specifically states that the PUC can "do all things ... in the exercise of *such power.*" (emphasis added). Thus, reading the portion of the section relied on by the majority in context with the entire section, the PUC can do all things which are necessary or convenient to adopt all necessary rates, charges, and regulations; to prevent unjust discriminations and extortions; and to supervise and regulate public utilities. In essence, the language relied upon by the majority is not an independent grant of power, but only authority to engage in activities which are necessary and convenient to exercise power granted.

I agree with the majority that the PUC has authority to order reparations in cases initiated on its own motion. However, I find the grant of power in title 6 of article 40, not title 3. Section 40–6–119(1), 17 C.R.S. (1984), allows the PUC to order reparation under certain circumstances "[w]hen complaint has been made to the commission." Section 40–6–108(1)(a), 17 C.R.S. (1984), provides that a "[c]omplaint may be made by the commission on its own motion or by any corporation, person, chamber of commerce. . . ." Applying the rule of statutory construction cited by the majority that two statutes concerning the same subject matter are to be read together to the extent possible so as to give effect to legislative intent, the term "complaint" in section 40–6–119(1) should be read in light of section 40–6–108(1)(a), and interpreted to include both complaints made by the PUC and complaints made by others (corporations, persons, the chamber of commerce, etc.). Section 40–6–119 gives the PUC power to order reparations when: (1) a complaint has been made to the PUC concerning any rate, etc.; and (2) the PUC has found that the public utility has charged an excessive or discriminatory amount. Section 40–6–108(1)(a) establishes what entities may make a complaint to the PUC.

Interpreting the term "complaint" in section 40–6–119(1) to include both complaints made by the commission and complaints made by others is not only consistent with the above-stated rule of statutory construction, but is also consistent with the PUC's interpretation of that term. *In Re Citizens Utilities Company,* 67 PUR(NS) 53 (1947) (PUC ordered reparation in case where it initiated the complaint, and rejected the utility's argument that section 56, Chap. 137, 1935 Colo.Stat.Anno. (now section 40–6–119, 17 C.R.S. (1984)), comes into operation only on the "complaint" of a community or customer of the utility).

Applying the above analysis of construing section 40–6–119 in light of 40–6–108, the two-year statute of limitations in section 40–6–119(2), which expressly applies to "[a]ll complaints," limits both complaints initiated by the PUC and those initiated by others. Thus, I dissent to the majority's holding that the two-year statute of limitations in 40–6–119(2) does not apply to cases where the PUC has ordered reparation in cases initiated on its own motion.

Furthermore, implicit in the majority's holding that section 40–3–102 grants reparation power to the PUC, is the conclusion that this section grants the PUC power to order interest on reparations. Again, I believe this reading of section 40–3–102 is too broad. In my view, the power of the PUC to order the payment of interest is found in section 40–6–119 which expressly states that the PUC can order reparation "with interest." Although Peoples has not argued that the PUC ordered a rate of interest in excess of its power when it ordered 13.21% interest on the reparation, I can find no provision in title 40 which specifies what rate of interest may be ordered, and thus believe the general statutory provision on legal rate of interest is applicable. § 5–12–101, 2 C.R.S. (1984 Supp.). Even

though I agree with the majority's statement in Part IV that the PUC may modify its original decision if it appears that it was in any respect unjust or unwarranted, I disagree with its conclusion that the PUC had authority to modify the rate to 13.21%, since section 5–12–101 provides that, "If there is no agreement or provision of law for a different rate, the interest on money shall be at the rate of eight percent per annum, compounded annually."

Not only do I disagree with the majority's holding that section 40–3–102 grants the PUC the power to order reparations in a case it initiated, but I also believe the resulting dual standard of the statute of limitations is illogical. If section 40–3–102 grants the PUC power to order reparation when the PUC initiated the complaint, then there is no limitation established for when the complaint can be filed. However, it is clear that when a complaint is filed by an entity other than the PUC, section 40–6–119(2) establishes a two-year statute of limitations. There is no reason to believe the legislature intended that there be no time limit on complaints initiated by the PUC, but a two-year limit on complaints initiated by others in light of the fact that the PUC is more capable than other entities of procuring sufficient information to determine whether there are appropriate grounds for complaint. *See In Re Citizens Utilities Company,* 67 PUR(NS) at 59.