John E. ARCHIBOLD; Harry A. Galligan, Jr.; Edythe S. Miller; and John B. Stuelpnagel, Petitioners–Appellants,

v.

The PUBLIC UTILITIES COMMISSION OF the STATE OF COLORADO; and Raymond L. Gifford, Robert J. Hix, and Polly Page, Commissioners thereof in their official capacity; and U S West Communications, Inc. n/k/a Qwest Communications International, Inc., Respondents–Appellees.

No. 01SA414.

Supreme Court of Colorado,
En Banc.

Dec. 2, 2002.

John B. Stuelpnagle, Grand Junction, Colorado, Attorney for Petitioners–Appellants.

Ken Salazar, Attorney General, Anne K. Botterud, Assistant Attorney General, Denver, Colorado, Attorneys for Respondents–Appellees, The Public Utilities Commission of the State of Colorado and Raymond L. Gifford, Robert J. Hix, and Polly Page, Commissioners thereof in their official capacity.

Kris Ciccolo, Hale Hackstaff Tymkovich, Timothy M. Tymkovich, Richard A. Westfall, Denver, Colorado, Attorneys for Respon-dent–Appellee, U S WEST Communications, Inc. n/k/a Qwest Communications International, Inc.

Justice HOBBS delivered the Opinion of the Court.

Pursuant to section 40–6–115(1), 11 C.R.S. (2002), petitioners Archibold, Galligan, Miller, and Stuelpnagel (Archibold) appeal a decision of the Public Utilities Commission (PUC) requiring Qwest Communications (Qwest) to pay reparations to customers for violations of the PUC rules. Archibold alleges that the PUC should have sought civil penalties against Qwest for those violations instead of selecting a reparations remedy. The district court dismissed the appeal, finding the case to be moot because Qwest had already paid the required reparations to customers, in compliance with the PUC's decision. We affirm the dismissal of this appeal, but on different grounds. We hold that the PUC's selection of a reparations remedy instead of a civil penalties remedy did not exceed its authority.

I.

The PUC staff investigated Qwest Communications International, Inc., formerly known as U S WEST Communications,[1] for alleged violations of the PUC rules regulating telecommunication service providers. In July 1999, the PUC issued an Order to Show Cause, directing Qwest to appear at a PUC hearing and demonstrate why the PUC should not sanction the company for violating commission regulations.

Shortly after the PUC issued its Order to Show Cause, Archibold filed for intervention in the proceedings. Citing Qwest's monopoly status as the sole provider of local exchange service, Archibold's stated goal in intervening was to "ensure that any remedial action taken by the commission is consistent with current Colorado law." The PUC granted Archibold's motion to intervene.

The Office of Consumer Counsel (OCC) intervened in the proceeding as a matter of

---

1. At the time of the PUC investigation and hearing, respondent was known as U S WEST Communications, Inc.; however, U S WEST merged with Qwest Communications International, Inc. in July 2000. For clarity, we refer to respondent as Qwest, both before and after the merger.

right, explaining that any remedy that the PUC would impose could affect consumers and the public interest, the viewpoint that the OCC is statutorily established to represent. §§ 40–6.5–104(1), –106(1)(b), 11 C.R.S. (2002). *See Pub. Serv. Co. v. Trigen–National Energy Co.*, 982 P.2d 316, 326 (Colo. 1999) (explaining that the OCC has authority to ascertain compliance with the statutory criteria for the protection of the public interest).

The PUC held a public hearing on the record to determine whether Qwest had violated any commission regulations and, if so, to select the remedy or remedies for those violations. The PUC staff, the OCC, and Qwest filed written testimony and presented witnesses at the hearing; Archibold did neither.

The OCC and the PUC staff recommended to the PUC that it select the remedy of reparations to consumers and ratepayers. In a post-hearing written statement, Archibold requested the PUC to reject reparations and seek civil penalties against Qwest.

The PUC issued its Decision on Order to Show Cause, finding that Qwest violated the PUC rules 84,451 times.[2] It ordered reparations to customers. The PUC calculated the reparations by examining information in commission files, including reports filed by Qwest.[3] The PUC took administrative notice of this information,[4] but later supplemented the record with information that had provided a basis for its calculations. The PUC explained, in detail, the processes it used to calculate the reparations.

Archibold argued that the PUC should seek civil penalties and not award reparations because the PUC could not determine either the identity of specific customers who had paid excessive charges or the amount each customer was overcharged. The PUC decided, nonetheless, to award reparations according to a methodology it found to be reasonably designed to redress the overcharges. It explained that Qwest's customers had experienced service defaults and paid for service they had not received. It rejected Archibold's argument that reparations should not be ordered and only civil penalties would suffice to redress the Qwest violations:

> As for the suggestion that we cannot order reparations in this case because the record does not identify specific customers who paid excessive charges ... we conclude: Most of the rule requirements at issue here ... do not lend themselves to identifying the specific customers who were harmed by a violation of the rules. The nature of the interconnected public switched telephone network derives substantial value from being able to communicate with others. To some extent, as other customers have problems with service

---

**2.** The PUC found that Qwest had violated five PUC rules: 1) 397 violations of 4 Colo.Code Regs. § 723–2–21.2.4 (2002) (requiring telephone companies to acknowledge calls to published repair service or business phone numbers within twenty seconds, and requiring an employee to answer eighty-five percent of such calls within sixty seconds); 2) 44 violations of 4 Colo.Code Regs. § 723–2–22.1 (2002) (forbidding telephone companies from receiving more that eight customer trouble reports for jurisdictional services per one hundred access lines per local exchange center, averaged over three months); 3) 44,315 violations of 4 Colo.Code Regs. § 723–2–22.2 (1998) (requiring telephone companies to clear eighty-five percent of all out-of-service reports within twenty-four hours, averaged over three months); 4) 30,459 violations of 4 Colo.Code Regs. § 723–2–24.4.2 (1995) (requiring telephone companies to provide basic local exchange service to new customers within 150 working days); and 5) 9,236 violations of 4 Colo.Code Regs. § 723–2–15.1.2 (1999) (requiring local exchanges to hold at least four hours of battery reserve rated for peak traffic loads for each local central office, toll switching or tandem switching office). The PUC also found that Qwest violated section 40–3–101, 11 C.R.S. (2002) (requiring telephone companies to provide reasonable services, equipment, and facilities). However, the PUC did not find that Qwest violated section 40–3–106(1), 11 C.R.S. (2002) (forbidding a telephone company from charging unreasonably different rates of service for different localities or classes of customers).

**3.** One commissioner, Raymond Gifford, dissented in part, asserting that the record contained insufficient evidence to support specific monetary reparations.

**4.** *See Consol. Freightways Corp. of Del. v. Pub. Utils. Comm'n*, 158 Colo. 239, 253, 406 P.2d 83, 90 (1965) (stating that "the Commission can take notice of other evidence in its files, annual statements and data gathered through its own investigation").

quality or connectivity, other customers are adversely impacted and the value paid-for is not received. Nevertheless, the method we adopt for awarding reparations here is reasonably designed to refund excessive charges to those groups of ratepayers ... who were affected by the rule violations found here.

In response to the PUC's reparations order, Archibold filed an application for reconsideration, reargument, and rehearing. The PUC granted a limited rehearing to allow parties an opportunity to submit testimony and exhibits regarding the methodology the PUC used to calculate reparations. The PUC entered an interim stay of its decision and order, in order to prevent customer confusion in the event that the refund amount was changed on rehearing. Archibold did not present any testimony or exhibits at the rehearing; Qwest, the OCC and the PUC staff filed comments on the reparations methodology.

After the rehearing, the PUC adjusted and explained its methodology and ordered Qwest to pay customer reparations in the amount of $12,695,581, with interest at 10.11% from the effective date of the decision until the reparations were paid. The PUC refused to grant Archibold's request to institute a suit for civil penalties. *See* §§ 40–7–105, –109, 11 C.R.S. (2002). Commissioner Robert Hix filed a supplemental statement to the Decision on Rehearing, enunciating his

position that the PUC should have proceeded "to state district court to enforce Colorado statutes and rules with respect to [Qwest's] violations of the Held Order Rule, 4 CCR 723–2–24, and to seek fines for these violations." [5]

Filing a motion for reconsideration, Archibold requested the commission to institute a court case through the Attorney General, in accordance with the dissent of Commissioner Hix. The PUC denied the motion.

In October and November 2000, Qwest paid the PUC-required reparations in full, with interest. Archibold took an appeal by means of certiorari to the district court under section 40–6–115(1), asking the court to set aside the reparations order and order the PUC to request the Attorney General to institute a suit for civil penalties. § 40–6–115(1), 11 C.R.S. (2002); *see Trans Shuttle, Inc. v. Pub. Utils. Comm'n,* 58 P.3d 47, 48–50 (Colo. 2002) (explaining certiorari procedure for appeal of a PUC decision).

The district court ordered the PUC to certify the record and, later, dismissed the appeal as moot because Qwest had already paid the required reparations to its customers. Archibold moved for reconsideration and amendment of judgment, which the district court denied. On appeal under section 40–6–115(5), 11 C.R.S. (2002), Archibold requests that we set aside the reparations payment and order the PUC to commence a civil penalties lawsuit.[6]

---

**5.** Commissioner Hix stated: "I considered all rationalizations suggested here (*e.g.* the Commission's limited resources to pursue a court action, that fines upon [Qwest] would be paid to the state treasury and would not benefit ratepayers, *powerful political pressures could result in adverse consequences for the agency,* etc.); none is valid." (emphasis supplied by Commissioner Hix).

**6.** Archibold's opening brief lists the following issues:

1. Did the District Court err by its failure to address whether the awarding of payment of "refunds" to certain customers with insufficient or lack of [sic], evidence; and using calculations based upon number of violations by [Qwest]? Were such awards fines or penalties, which can only be awarded by a district court in the State of Colorado?

2. Did the District Court err by not addressing the issue of the Commission not instituting

a proceeding under § 40–7–101, *et. seq.,* C.R.S. against [Qwest], to enforce its provisions for the recovery of penalties due the State of Colorado for over 30,000 violations of Commission Rule 24.4.2 (held service orders/failure to provide services)?

3. Did the District Court err by its failure to determine whether the Commission violated its role as a neutral decision-maker by supplementing the record with new evidence to allegedly justify relief other than that proposed by any party to the Commission proceeding, and by limiting cross-examination on such evidence?

4. Did the District Court err by its failure to determine whether the Order of the Commission for payment of interest based upon [Qwest]'s currently authorized rate-of-return on rate base was legally proper, and whether the Commission's findings and conclusions were made subsequent to hearing without opportunity for comment or cross examination?

## II.

We affirm the dismissal of this appeal, but on different grounds. We hold that the PUC's selection of a reparations remedy instead of a civil penalties remedy did not exceed its authority.

### A.

### Mootness

 We first determine that this case is not moot. "A case is moot when the relief sought, if granted, would have no practical legal effect. '[W]hen issues presented in litigation become moot because of subsequent events, an appellate court will [generally] decline to render an opinion on the merits of an appeal.'" *State Bd. of Chiropractic Exam'rs v. Stjernholm*, 935 P.2d 959, 970 (Colo.1997) (internal citations omitted) (quoting *Van Schaack Holdings, Ltd. v. L.C. Fulenwider*, 798 P.2d 424, 427 (Colo.1990)).

In this case, Qwest had already paid reparations as ordered by the PUC. However, the remedy Archibold seeks on appeal of the PUC decision and order is to direct the institution of a civil penalties lawsuit. Archibold claims that the statutes applied to the facts of this case require the PUC to collect civil penalties. Although we disagree with Archibold on the merits of his contention, deferring as we do to the PUC's selection of a reparations remedy, the issue Archibold seeks to litigate is plainly not moot. This case presents an existing legal controversy, *see Bd. of County Comm'rs v. Park County Sportsmen's Ranch, LLP*, 45 P.3d 693, 698

(Colo.2002), and our decision will have legal effect. *See Stjernholm*, 935 P.2d at 970.

The fulcrum of Archibold's appeal is that the PUC pursued the "wrong" remedy, and we should order substitution of the "right" remedy.[7] We now examine the merits of this contention.

### B.

### The PUC Selection of Remedies

 To rectify unlawful utility action, the General Assembly provided the PUC with four primary remedies to select from.[8] These remedies, which include a combination of administrative remedies and judicial remedies, are not mutually exclusive; the PUC may choose to pursue one or more of them. § 40–7–103, 11 C.R.S. (2002).

 First, the PUC may administratively order a public utility to pay reparations to customers. Under section 40–6–119(1), the PUC may impose reparations if it finds that a public utility has charged "an excessive or discriminatory amount" for a product, commodity, or service, after a customer has complained about the utility and the PUC has conducted an investigation. § 40–6–119(1), 11 C.R.S. (2002). The PUC may order reparations based on PUC-initiated investigations, pursuant to its power to regulate utilities under section 40–3–102. § 40–3–102, 11 C.R.S. (2002); *Peoples Natural Gas Div. v. Pub. Utils. Comm'n*, 698 P.2d 255, 263 (Colo. 1985).

 Second, the PUC may request the Attorney General to bring a suit for civil penalties for payment to the state treasury.[9]

---

5. Did the District Court erred [sic] by dismissing this matter contrary to the decision of the Colorado Supreme Court in *O'Bryant v. P.U.C. of State of Colo.*, 778 P.2d 648 (Colo. 1989)?

6. Did the District Court err by dismissing the action brought by [Archibold] on the erroneous basis that [Archibold] had not sought a stay of the Commission's Decision notwithstanding the fact that the Commission itself had stayed its decision pending judicial review?

7. Upon reviewing all of the issues Archibold lists for review, we find none that justifies reversal of PUC's decision and order.

8. We do not intend our discussion of remedies available under Colorado Public Utilities Law to

be definitive or limiting. The commission has authority to investigate utility law violations and issue corrective decisions and orders, *see, e.g.*, section 40–6–109(3), 11 C.R.S. (2002), subject to judicial review under section 40–6–115, 11 C.R.S. (2002). In addition, a corporation or person may have an action for damages as provided by section 40–7–102, 11 C.R.S. (2002); such actions do not preclude the commission from pursuing the remedies available to it, *see* section 40–7–102(2), 11 C.R.S. (2002).

9. Every violation of the law is a separate and distinct offense, and each day that a violation persists is a separate offense. § 40–7–105(2), 11 C.R.S. (2002). The penalty is up to $2,000 per offense. § 40–7–105(1), 11 C.R.S. (2002).

§§ 40–7–101, –109, 11 C.R.S. (2002); *Peoples Natural Gas Div.*, 698 P.2d at 262. Civil penalties are meant to punish a perpetrator, to deter future unlawful acts, and to protect the public interest by shifting costs from the public to the perpetrator; civil penalties do not reimburse consumers for overpayment or make them whole for injuries received. *May Dep't Stores Co. v. State ex rel. Woodard*, 863 P.2d 967, 972 (Colo.1993); *May v. Colo. Civil Rights Comm'n*, 43 P.3d 750, 758–59 (Colo. App.2002).

■ Third, the PUC may refer the case to the Attorney General for commencement of a lawsuit for relief against current or pending law violations through injunction or mandamus. § 40–7–104(1), 11 C.R.S. (2002).

■ Fourth, the PUC may refer to the prosecution authority facts that may warrant criminal prosecution against any utility officer, agent, or employee who violates the law or assists a public utility in violating the law. § 40–7–106, 11 C.R.S. (2002).

■ The PUC is not always required to seek a litigation remedy:

Certainly the general assembly did not by these [enforcement] sections contemplate that every alleged violation of the terms of a certificate of public convenience and necessity had to be heard in a court of record. The commission has inherent power to investigate alleged violations and to make its orders, subject to review as provided by law.

*Eveready Freight Serv., Inc. v. Pub. Utils. Comm'n*, 131 Colo. 172, 175–76, 280 P.2d 442, 444 (1955).

■ We accord great deference to the PUC's remedy choice because the commission has special expertise in public utility regulation and its choice of remedy resides at the core of its responsibility and discretion. *Mountain States Tel. and Tel. Co. v. Pub. Utils. Comm'n*, 763 P.2d 1020, 1030 (Colo. 1988). We presume that the PUC's decisions and orders are valid; we review the PUC's findings on the record in the light most favorable to the commission's disposition; and only in the rarest case do we reject the PUC's selection of remedy. *Id.; see also Pub. Serv. Co. of Colo. v. Pub. Utils.*

*Comm'n*, 26 P.3d 1198, 1204–05 (Colo.2001); *City of Boulder v. Pub. Utils. Comm'n*, 996 P.2d 1270, 1274–75 (Colo.2000). "It is well established that '[o]nly in the rarest cases, limited primarily to demonstrated recalcitrance by the agency, should a court attempt to substitute its remedy for that of the agency.'" *Id.* quoting 2 Charles H. Koch, Jr., *Administrative Law and Practice* § 8.7, at 14 (1985).

### C.

### The PUC's Choice of Remedy in this Case

Here, the PUC analyzed the available remedies and chose to order reparations; it rejected the option of seeking civil penalties through the institution of a lawsuit filed by the Attorney General. We affirm the PUC's choice.

#### 1. Reparations

We review the PUC's decisions only to determine "whether the commission has regularly pursued its authority, including a determination of whether the decision under review violates any right of the petitioner under the constitution of the United States or of the state of Colorado, and whether the decision of the commission is just and reasonable and whether its conclusions are in accordance with the evidence." § 40–6–115(3), 11 C.R.S. (2002); *see CF & I Steel, L.P v. Pub. Utils. Comm'n*, 949 P.2d 577, 584–85 (Colo. 1997).

Upon determining this case not to be moot, we also determine that we need not remand this case to the district court for further review. Archibold's primary contention in this appeal is one of law, whether the commission must seek civil penalties. We determine as a matter of law that the statutes do not require the commission to invoke that remedy.

■ The record documents the PUC's choice of remedies in this case. The PUC considered the remedies available to redress the Qwest rule violations and selected reparations. The PUC explained in its decision that reparations are "related to the rates paid (or might be paid) by customers for

regulated services [and may not be] specifically designed to adjust rates prospectively to reflect the quality of service actually provided by [Qwest] in the future." This interpretation of reparations is reasonable and consistent with our previous examination of reparations. *See Peoples Natural Gas Div.*, 698 P.2d at 257, 263 (holding that the PUC properly awarded reparations to customers who had paid for and received lower quality products than the utility was legally required to deliver, and stating that reparations provide a remedy for overcharging of a utility's ratepayers); *Bonfils v. Pub. Utils. Comm'n*, 67 Colo. 563, 577, 189 P. 775, 780 (Colo.1920) (upholding agency finding that "the amount of reparation should be the difference between the rates paid and the reasonable rates for the period").

The PUC then considered Archibold's contention that reparations may only be given to customers who could be specifically identified as having paid excess charges to Qwest. It reasoned that "no authority holds that the Commission is unable to order customer reparations in the absence of the ability to precisely identify those customers who paid excessive charges and the precise amounts overpaid by each customer." The PUC found that Qwest customers paid too much for the substandard service they received. The PUC arrived at a method for calculating the reparations after hearing the arguments of the PUC staff, the OCC, and Qwest. Archibold did not offer any counter evidence or argument on reparations methodology or amount, continuing to insist that (1) only civil penalties collected at $2,000 per violation in a court of law would suffice to redress the rule violations and (2) the reparation payments the commission ordered were actually inadequate civil penalties.

Contrary to Archibold's contention, we determine that the PUC's order for payment of reparations to Qwest customers and its choice not to seek civil penalties were within its legal authority for remedy selection.

### 2. Civil Penalties

■ Archibold contends that the PUC should have instituted a lawsuit for the collection of civil penalties. In construing statutory provisions, our primary purpose is to effectuate the intent of the General Assembly. *Adams v. Farmers Ins. Group*, 983 P.2d 797, 801 (Colo.1999). In order to discern such intent, we first look to the statutory language itself, giving words and phrases their commonly accepted and understood meaning. *Id.*

■ Civil penalty litigation is brought in the name of the people:

[a]ctions to recover penalties ... shall be brought *in the name of the people* of the state of Colorado ... [and] shall be commenced and prosecuted to final judgment by the attorney general.... Any such action may be compromised or discontinued on application of the commission upon such terms as the court shall approve and order.

§ 40–7–109, 11 C.R.S. (2002) (emphasis added). The PUC may request the Attorney General to bring a lawsuit for the enforcement of provisions of the statutes or the constitution. § 40–7–101, 11 C.R.S. (2002).

Clearly, the General Assembly has consigned the pursuit or settlement of litigation for civil penalties to the PUC and the Attorney General, on behalf of the people. § 40–7–109, 11 C.R.S. (2002). Significantly, the General Assembly did not provide a citizen suit provision under the Public Utilities Law, allowing individuals such as Archibold to institute a civil penalties lawsuit if the PUC does not.

■ Archibold's request for relief is equivalent to a request for mandamus, although this is not an appeal of a denial of mandamus relief. He seeks an order compelling the PUC to commence litigation through the Attorney General, even though the statute does not require the PUC to institute a civil penalties lawsuit for rule violations. This is not a case in which the PUC has failed to act. Through a proceeding on the record, it ordered reparations and rejected collection of civil penalties. Mandamus is appropriate only if a plaintiff has a clear right to the relief sought, the agency has a clear duty to perform the act requested, and there is no other available remedy. *State v. Bd. of County Comm'rs*, 897 P.2d 788, 791 (Colo.1995) *citing Gramiger v.*

*Crowley,* 660 P.2d 1279, 1281 (Colo.1983). We will not issue mandamus unless the administrative act requested is purely ministerial in nature, and the agency has a clear legal duty to perform the act. *Ahern v. Baker,* 148 Colo. 408, 414, 366 P.2d 366, 369 (1961); *Jones v. Colo. State Bd. of Chiropractic Exam'rs,* 874 P.2d 493, 494 (Colo.App. 1994).

 Archibold desires an enforcement remedy consigned to the agency by statute, but we typically refrain from ordering the executive branch to take an action committed to prosecutorial discretion. *People v. Thorpe,* 641 P.2d 935, 938 (Colo.1982); *see W. Food Plan v. Dist. Court,* 198 Colo. 251, 255–57, 598 P.2d 1038, 1040–41 (1979) (refusing to order an injunction prohibiting the Attorney General from filing a prosecution); *People ex rel. Dunbar v. Gym of Am.,* 177 Colo. 97, 117, 493 P.2d 660, 670 (1972)(stating that "[t]he right of officials to meet statutory evils as they arise and according to the manner in which they arise must always remain within the sound discretion of the statute's enforcement officer").

Because the statutes do not obligate the PUC to collect civil penalties for violation of its rules and the commission's selection of a reparations remedy in this case is not contrary to law, unjust, or unsupported by the record, *see* section 40–6–115(3), 11 C.R.S. (2002), we uphold the PUC's decision and order.

### III.

Accordingly, we affirm the judgment of the district court dismissing this case.