GTE SPRINT COMMUNICATIONS
CORPORATION,
Plaintiff–Appellant,

v.

PUBLIC UTILITIES COMMISSION OF
the STATE OF COLORADO; and
Edythe S. Miller, Andra Schmidt and
Ronald L. Lehr, Commissioners, De-
fendants–Appellees,

and

the Mountain States Telephone and
Telegraph Company, Inc., AT & T Com-
munications of the Mountain States,
Inc., and Western Union Telegraph
Company, Co–Defendants–Co–Appel-
lees.

No. 86SA142.

Supreme Court of Colorado,
En Banc.

April 4, 1988.

McGloin, Davenport & Severson, Michael M. McGloin, Denver, Phyllis A. Whitten, Burlingame, Cal., Reboul, MacMurray, Hewitt, Maynard & Kristol, Robert M. Peak, New York City, for plaintiff-appellant.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Mark A. Davidson, Eugene E. Cavaliere, Asst. Attys. Gen., Denver, for defendants-appellees.

Eiberger, Stacy & Smith, David H. Stacy, Steven H. Denman, Russell P. Rowe, Denver, for co-defendant-co-appellee Mountain States Tel. & Tel. Co.

VOLLACK, Justice.

GTE Sprint Communications Corporation (Sprint) appeals the judgment of the Denver District Court affirming the decision of the Public Utilities Commission (Commission). At issue is whether the Commission regularly pursued its authority in requiring Sprint to reimburse Mountain States Telephone and Telegraph Company (Mountain Bell) for revenue diverted to Sprint as a condition of certification to compete in Colorado's interLATA telecommunications markets. We agree with the district court that the Commission regularly pursued its authority in requiring Sprint to make such compensation to Mountain Bell. Accordingly, we affirm.

I.

Some background concerning the recent history, development, and terminology of the telecommunications industry is critical to an understanding of the legal issues surrounding Sprint's claims. As noted by the Commission, this case is but one outgrowth of the divestiture of American Telephone & Telegraph Company (AT & T) from its operating companies. Prior to divestiture, states were the smallest unit of measurement of telecommunications markets for purposes of regulation. Under the Communications Act of 1934, Pub.L. No. 73–416, 48 Stat. 1064 (1934) (codified at 47 U.S.C. §§ 151–757 (1934 & 1987 Supp.)), federal law regulated interstate phone calls while state law regulated intrastate telephone calls. See 47 U.S.C. § 201(a) (1934) (federal regulatory authority), § 152(b) (1978) (state regulatory authority). AT & T, the sole telecommunications carrier authorized to provide both local and long distance telephone service in the United States, structured itself to reflect this regulatory dichotomy: AT & T handled long distance voice, data and facsimile transmission service, while its operating companies provided local exchange networks.

As a result of improved technology, falling costs, and a change of national policy to regulated competition in the 1970s, telecommunications common carriers such as Sprint, MCI Telecommunications Corporation (MCI), and Western Union Telegraph Company (Western Union) were permitted to enter the interstate long distance telecommunications market that had previously been occupied solely by AT & T. MacAvoy & Robinson, *Winning by Losing: The AT & T Settlement and Its Impact on Telecommunications*, 1 Yale J. on Reg. 1, 2–5 (1983). The intrastate long distance telecommunications market remained in the hands of AT & T subsidiaries.

Although the other common carriers were permitted to compete with AT & T in the interstate long distance telecommunica-

tions market, AT & T retained its technological superiority in providing convenient, clear transmission of long distance signals, which it refused to share with the other common carriers. The electronic signal interconnector system available to the other common carriers, called Feature Group A, lacked among other things[1] a feature called automatic number identification, which permits a carrier to identify and record the point of origin of a telephone signal. Without automatic number identification, neither local exchange companies nor the other common carriers could differentiate an interstate telephone call from an intrastate telephone call.[2] The superior access to signal transmission systems that AT & T enjoyed over the other common carriers continued in the long distance telecommunications market between 1978 and 1982.

As a result of unequal access in the long distance telecommunications market and other alleged monopolistic practices, the United States Department of Justice brought an antitrust claim against AT & T in 1974. This claim was settled in 1982 as a court-approved order known as the mod- ified final judgment. *United States v. American Tel. & Tel. Co.*, 552 F.Supp. 131, 226–32 (D.D.C.1982), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983).

The modified final judgment divested AT & T from its regional operating companies, one of which was Mountain Bell.[3] New geographic classifications were also created. States were divided into local access and transport areas (LATAs), which are geographic zones centered about a "city or other identifiable community of interest." *United States v. Western Elec. Co.*, 569 F.Supp. 990, 994 (D.D.C.1983).[4]

Under the modified final judgment, national long distance telephone service was divided into three categories for purposes of regulation: interstate service, regulated by the Federal Communication Commission (FCC); intrastate interLATA service, regulated by the states; and intrastate intraLATA service, also regulated by the states. *See GTE Sprint Communications Corp. v. AT & T Communications*, 230 Va. 295, 298, 337 S.E.2d 702, 704 (1985). Operating companies such as Mountain Bell retained

---

**1.** In order to make a long distance telephone call on a Feature Group A system, callers could not simply dial the digit "1" plus the area code and the desired telephone number as they could on the AT & T network. Instead, the caller had to dial a local telephone number, await a signal, enter a personal identification number, and then dial the area code plus the desired telephone number. Such a procedure required the caller to dial as many as fifteen additional digits.

Feature Group A is inferior in two other respects to Feature Group C, the system available to AT & T. First, telephones required a tone generating device in order to access the systems of the other common carriers. The tone generating device had to be separately purchased for ordinary rotary dial telephones. Second, and just as important to callers, voice transmission signals lacked the fidelity of AT & T signals. *See* Wiley, *The End of Monopoly: Regulatory Change and the Promotion of Competition,* in *Disconnecting Bell: The Impact of AT & T Divestiture* 39–40 (1984).

**2.** A typical long distance telephone call from Denver to Pueblo originates in the premises of a Denver telephone subscriber. The signal travels over facilities owned by Mountain Bell, the local exchange company, to an interconnector device in Denver that routes the signal over facili- ties owned by a common carrier such as AT & T or Sprint, to an interconnection device in Pueblo, which finally travels over facilities owned by Mountain Bell to the premises of the recipient of the call.

Common carriers pay "access charges" to local exchange companies in exchange for use of local exchange facilities at one or both ends of a call. *See* Zielinski, *Regulation and Public Policy After Divestiture: The State Regulators,* in *Disconnecting Bell: The Impact of AT & T Divestiture* 106–09 (1984).

**3.** Regional operating companies were themselves transferred into regional financial holding companies. Mountain Bell is a part of U.S. West, Inc.

**4.** As a result of the modified final judgment, Colorado is subdivided into the Denver LATA, encompassing roughly the northern half and the southwestern quarter of the state, and the Colorado Springs LATA, encompassing the remaining southeast quarter of the state. A phone call that originates and terminates in the same LATA is an intraLATA call, while a phone call that originates in one LATA and terminates in another is an interLATA call. Thus, a call from Denver to Greeley is an intraLATA call, while a call from Denver to Pueblo is an interLATA call. *See* § 40–15–102(13), (15), (17), 17 C.R.S. (1984).

**215**

the exclusive right to service intraLATA markets through local direct distribution networks, while AT & T and the other common carriers received the exclusive right to service interLATA markets. Finally, the operating companies were required to provide the other common carriers with access to the local exchange network "equal in type, quality and price" to that of AT & T. *United States v. American Tel. & Tel.*, 552 F.Supp. at 196. The plan created by the modified final judgment was scheduled to go into effect on January 1, 1984.

Before that plan could go into effect, however, the Commission determined that, despite the national movement toward regulated competition, the Colorado interLATA telecommunications markets would be regulated under the doctrine of regulated monopoly, with the result that only one telecommunications carrier could be certified to service them. On December 23, 1983, the Commission granted AT & T Communications of the Mountain States, Inc., a subsidiary of AT & T, a certificate of public convenience and necessity as the exclusive provider of interLATA telecommunications service for the state of Colorado.

The General Assembly responded to the Commission's decision by promulgating House Bill 1264. House Bill 1264, signed into law on April 2, 1984,[5] and codified as sections 40–15–101 to –110, 17 C.R.S. (1984), made clear the intent of the legislature that the Colorado interLATA telecommunications market be governed by the doctrine of regulated competition, thereby permitting more than one carrier to provide service to a given geographic area. *See* § 40–15–101(7), 17 C.R.S. (1984). The General Assembly recognized that some competition in the Colorado interLATA markets is desirable, but that unregulated competition can be destructive to the public interest.[6] *See* § 40–15–101, 17 C.R.S. (1987 Supp.); *Morey v. Public Util. Comm'n*, 629 P.2d 1061, 1065–66 (Colo.1981). The Commission was therefore empowered to protect the public interest by issuing certificates of public convenience and necessity to those telecommunications carriers desiring to provide service to Colorado interLATA markets which the Commission believed would further the needs of the public. § 40–15–104(1), 17 C.R.S. (1984). The General Assembly also reconfirmed its intent to maintain Colorado's intraLATA markets under the doctrine of regulated monopoly, which limits the number of providers of telecommunications service within a given geographic area to one. §§ 40–15–101(8), –104(2), 17 C.R.S. (1984).

Once the regulatory scheme established by House Bill 1264 was signed into law, other common carriers became eligible to apply for certificates of public convenience and necessity to service Colorado's interLATA telecommunications markets. But one problem remained. The provision of the modified final judgment requiring regional operating companies to provide equal access to all carriers of interLATA service did not become effective until Sep-

---

**5.** Article 15 of Title 40 was repealed and reenacted in 1987. At all times relevant to this appeal, however, the version of Article 15 in force in 1984 controls.

**6.** Section 40–15–101 contains the following legislative declaration:

The general assembly hereby finds, determines, and declares that it is the policy of the state of Colorado to promote a competitive telecommunications marketplace while protecting and maintaining the wide availability of high-quality telecommunications services. Such goals are best achieved by legislation that brings telecommunications regulation into the modern era by guaranteeing the affordability of basic telephone service while fostering free market competition within the telecommunications industry. The general assembly further finds that the technological advancements and increased customer choices for telecommunications services generated by such market competition will enhance Colorado's economic development and play a critical role in Colorado's economic future. However, the general assembly recognizes that the strength of competitive force varies widely between markets and products and services. Therefore, to foster, encourage, and accelerate the continuing emergence of a competitive telecommunications environment, the general assembly declares that flexible regulatory treatments are appropriate for different telecommunications services.

17 C.R.S. (1987 Supp.).

tember 1, 1986. *United States v. American Tel. & Tel.*, 522 F.Supp. at 196. In the interim, other common carriers desiring to enter the interLATA market were required to use the Feature Group A signal interconnector system, while AT & T used the more sophisticated Feature Group C system. Because Feature Group A lacked automatic number identification, it was impossible for the other common carriers to identify and divert intraLATA telephone calls through Mountain Bell's facilities. Neither was it possible under Feature Group A to prevent transmission of intraLATA calls through facilities of the common carriers by means of "blocking" switches. As a result, some intraLATA telephone calls were diverted through facilities owned by common carriers other than Mountain Bell. This condition, known as "intraLATA leakage," generated revenue for the carriers that would otherwise have accrued to Mountain Bell. AT & T did not experience intraLATA leakage because Feature Group C was capable of identifying, blocking, and diverting intraLATA calls properly through Mountain Bell's facilities. IntraLATA leakage theoretically disappears once equal access becomes available throughout Colorado to all common carriers of telecommunications service. The problem of intraLATA leakage is the focus of this case.

## II.

In the spring of 1984, Sprint, Western Union, and MCI filed applications for certificates of public convenience and necessity pursuant to section 40–15–103, 17 C.R.S. (1984). They sought to enter the Colorado interLATA telecommunications market then occupied solely by AT & T.

After conducting hearings, the Commission on February 14, 1985,[7] found that these "other common carriers" possessed the financial, technical and operational capability to provide interLATA telecommunications service in Colorado, and granted them certificates of public convenience and necessity subject to certain terms and conditions. One of these conditions was that the other common carriers reimburse Mountain Bell for revenue diverted to the common carriers as a result of intraLATA leakage.[8]

The other common carriers filed a timely application for rehearing, reargument and reconsideration of the Commission's certification decision of February 14. Sprint asserted that imposing a compensation requirement violates the supremacy clause, the commerce clause, the taking without just compensation clause, and the equal protection clause of the United States Constitution, as well as sections 40–7–111 (prohibiting regulation of foreign or interstate commerce in violation of the United States Constitution) and 40–3–106(1)(a) (prohibiting rate discrimination among utilities) of the 1984 Colorado Revised Statutes.

On May 7, 1985, the Commission granted in part and denied in part Sprint's application for reconsideration by modifying its February 14 decision,[9] but reaffirmed that

---

**7.** In its decision of August 21, 1984, the Commission granted temporary authority to Sprint and MCI to operate as a common carrier providing interLATA telecommunications service in Colorado. This temporary authority was made permanent in the Commission's decision of February 14, 1985 and made effective *nunc pro tunc* as of August 21, 1984. Consequently, compensation for intraLATA leakage will be computed from August 21, 1984 to the time in which equal access is complete in a given area.

**8.** The Commission imposed ten terms and conditions on Sprint, MCI, and Western Union. Of those ten terms and conditions, Sprint contests only the intraLATA compensation requirement.

**9.** The decision of May 7, 1985, granting reconsideration of the February 14 decision, denied all claims made in motions for reconsideration of the February 14 decision, with the following exceptions:

(1) the requirement that all common carriers must avail themselves of Feature Group D in both the originating and terminating directions was changed to require carriers to avail themselves of Feature Group D in the originating direction only;

(2) the manner of determining the extent of intraLATA leakage was changed from a sampling methodology to a census methodology;

(3) the time by which carriers must submit their determinations of the extent of intraLATA leakage was extended by sixty days; and

(4) the other common carriers' obligation to comply with Rule 13 of the Rules Governing Telephone Utilities, which deals with practices

the compensation requirement in the February 14 decision was not unconstitutional or otherwise illegal. After exhausting their administrative remedies, Sprint and MCI appealed the February 14 decision [10] to the Denver District Court pursuant to section 40–6–115(1), 17 C.R.S. (1984). The district court summarily concluded that the February 14 decision was just and reasonable, that the Commission had regularly pursued its authority in imposing a compensation requirement, and that the compensation requirement did not violate the common carriers' constitutional rights or the laws of Colorado.[11] Sprint and MCI appealed to this court pursuant to section 40–6–115(3). MCI subsequently withdrew its appeal after settling with Mountain Bell.

### III.

Sprint contends that the Commission did not regularly pursue its authority in requiring carriers to reimburse Mountain Bell for revenue diverted to Sprint through intraLATA leakage. We do not agree.

The Commission has broad authority to regulate the activities of public utilities. Colo. Const. art. XXV. This includes the power to do all things which are necessary or convenient to the exercise of its regulatory authority. § 40–3–102, 17 C.R.S. (1984). In the area of telecommunications, this authority extends to all providers of intrastate service. § 40–15–103(1), 17 C.R.S. (1984). Telecommunications carriers

such as Sprint are required to obtain certificates of public convenience and necessity to service interLATA markets, and the Commission has discretion to "attach to the exercise of the rights granted by said certificate such terms and conditions, as in its judgment, the public convenience and necessity may require." § 40–15–103(3).

Decisions of the Commission are generally subject to limited judicial review. Where the Commission's proceedings raise constitutional questions, however, we are required to "exercise an independent judgment on the law and facts." § 40–6–115(2), (3), (5), 17 C.R.S. (1984). In doing so, we recognize that actions of the Commission are presumed to be regular and will be upheld absent clear evidence to the contrary. *Public Util. Comm'n v. District Court*, 163 Colo. 462, 431 P.2d 773 (1967).

### A.

■ The General Assembly has determined that Colorado's intraLATA markets are to be regulated under the doctrine of regulated monopoly. § 40–15–104(2), 17 C.R.S. (1984). The Commission is therefore required to supervise and regulate all common carriers of interLATA telecommunications service in order to protect Mountain Bell's position as the sole provider of intraLATA service in Colorado. *See* §§ 40–3–102, 40–15–104(2), 40–15–105, 17 C.R.S. (1984).

In pursuing its statutory mandate, the Commission considered three proposed so-

---

in disconnecting telephone service, was temporarily waived.

**10.** Sprint appealed the decision of May 7 only to the extent that the Commission denied that the compensation requirement of the February 14 decision was unconstitutional or violated statutory law. *Sprint and MCI appealed two other decisions to the district court in Case No. 85CV11362.* In Decision No. C85–820, decided June 25, 1985, the Commission reaffirmed the decisions of February 14 and May 7 without substantive changes insofar as Sprint and MCI were concerned. In Decision No. C85–1039, decided August 13, 1985, the Commission again affirmed without change the decisions of February 14, May 7, and June 25. We will refer to all four of these decisions as "the February 14 decision" in order to avoid confusion and because the three subsequent decisions of May 7,

June 25, and August 13 were not substantive reevaluations of the constitutional and statutory claims decided by the Commission in its detailed decision of February 14.

**11.** The Commission did not determine the amount of intraLATA compensation owed to Mountain Bell in its decision of February 14, 1985. The February 14 decision merely determined that some compensation may be required as a condition of certification. The amount of compensation owed to Mountain Bell was determined in the Commission's decision of May 13, 1986. In that sense, the decisions upon which Sprint bases its appeal are divided into the certification decision of February 14 and the compensation decision of May 13. The compensation decision was separately appealed to the Denver District Court and is not now before us.

lutions to the problem of intraLATA leakage in its February 14 decision. The first proposal was to require Sprint and other common carriers to block all intraLATA calls. The second proposal was to permit them to complete intraLATA calls but to forbid them from billing their customers for such service. The third proposal was to permit them to complete such calls, bill their customers, and then remit to Mountain Bell the amount of revenue that would have accrued to Mountain Bell had it carried the calls over its facilities.[12]

The Commission rejected the first proposal for three reasons. First, blocking was not technically feasible because Feature Group A cannot block intraLATA calls. Second, blocking was not legally permissible because all interstate telecommunications carriers are obliged under federal law to complete all calls in the geographic region approved by the FCC. Finally, even if blocking were technically feasible and legally permissible, the Commission believed that blocking would defeat the public policy that all calls be completed whenever possible. The second proposal was rejected because such a solution would deprive Mountain Bell of revenue that it should have received and would grant a windfall to telephone subscribers making intraLATA calls. The third solution was therefore adopted as the most equitable of the three proposals.

As we have noted, "[w]hen two equally reasonable courses of action are open to the commission, a reviewing court cannot substitute its judgment for that of the commission in selecting the appropriate alternative." *Contact–Colorado Springs, Inc. v. Mobile Radio Tel. Serv.*, 191 Colo. 180, 183, 551 P.2d 203, 205 (1976) (citing *Answerphone, Inc. v. Public Util. Comm'n*, 185 Colo. 175, 522 P.2d 1229 (1974); *North Eastern Motor Freight, Inc. v. Public Util. Comm'n*, 178 Colo. 433, 498 P.2d 923 (1972)). Here the Commission chose to require Sprint to reimburse Mountain Bell for

revenue diverted to Sprint through intraLATA leakage rather than simply prohibiting Sprint from charging its customers. Either proposal would prevent Sprint from deriving revenue from intraLATA calls and would further the public policy that all telephone calls be completed whenever possible. Because each alternative was equally reasonable, we cannot say that its choice was inappropriate.

### B.

▪  Sprint argues that the Commission's certification decision is arbitrary and capricious because it is internally inconsistent. The internal inconsistency is alleged to arise from the Commission's decision to require carriers to pay compensation for calls they are required by the FCC to carry and powerless to divert to the appropriate facilities. We find nothing arbitrary and capricious with the Commission's decision.

A decision which is based on inconsistent findings by the Commission is arbitrary and capricious, and must be set aside. *Peoples Nat. Gas Div. v. Public Util. Comm'n*, 698 P.2d 255, 265 (Colo.1985). In *Peoples*, we set aside a decision that attempted to correct a problem that the Commission separately found to have subsided before the dispute arose. Such inconsistent findings rendered the decision nonsensical.

Here the decision of the Commission is not based on inconsistent findings. The Commission found that Sprint had completed calls that are licensed to be carried solely by Mountain Bell, and that as a result, revenue that would have accrued to Mountain Bell was diverted to Sprint. The Commission also found that the carriers could not prevent completion of intraLATA calls. A decision is not inconsistent merely because it requires a party to pay damages for conditions that are beyond its control. Indeed, other jurisdictions have imposed a compensation requirement on Sprint as an

---

**12.** A fourth alternative was apparently considered by the Commission but not discussed in its decision of February 14, 1985. The fourth proposal was to let the other common carriers complete the calls, bill their customers, and keep the revenue for themselves. This proposal was rejected because it would have permitted the other common carriers to provide service to intraLATA markets in violation of sections 40–15–101(8) and 40–15–104(2).

interim solution to the problem of intra-LATA leakage despite Sprint's inability to prevent such calls from being made. *See, e.g., GTE Sprint Communications Corp. v. AT & T Communications*, 230 Va. 295, 337 S.E.2d 702 (1985). The decision would have been arbitrary and capricious if it had imposed a compensation requirement on Sprint for intraLATA leakage despite a finding that Sprint had not carried intra-LATA calls. No such error is present here.

For these reasons, we conclude that the decision to require compensation for intra-LATA leakage is not based on inconsistent findings and is not otherwise arbitrary and capricious.

## C.

Sprint asserts that imposing a compensation requirement violates the supremacy clause, the commerce clause, the taking without just compensation clause, and the equal protection clause of the federal Constitution. Several of these claims depend for their validity on the amount that each telecommunication carrier is required to pay; that amount is to be determined in a proceeding that is not now before us. We therefore decline to address whether the compensation requirement violates the commerce clause or constitutes a taking of private property for public use without just compensation, and confine our discussion to whether the compensation requirement violates the supremacy clause or the equal protection clause.

### 1.

■ Sprint argues that the compensation requirement violates the supremacy clause of the United States Constitution. Specifically, Sprint claims that the Commission's compensation requirement stands as an obstacle to the accomplishment and execution of the full objectives of the Federal Communications Commission by creating an economic disincentive to compete in the interstate marketplace. The Commission denies that the compensation requirement stands as an obstacle to interstate competition. In support of this position, the Commission relies on 47 U.S.C. § 152(b) and *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355,

106 S.Ct. 1890, 90 L.Ed.2d 369 (1986). We are persuaded that the compensation requirement does not violate the supremacy clause.

The supremacy clause authorizes Congress to preempt conflicting state law. U.S. Const. art. VI, cl. 2. Preemption can occur in the following ways:

Pre-emption occurs when Congress, in enacting a federal statute, expresses a clear intent to pre-empt state law, when there is outright or actual conflict between federal and state law, where compliance with both federal and state law is in effect physically impossible, where there is implicit in federal law a barrier to state regulation, where Congress has legislated comprehensively, thus occupying an entire field of regulation and leaving no room for the States to supplement federal law, or where the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress. Pre-emption may result not only from action taken by Congress itself; a federal agency acting within the scope of its congressionally delegated authority may pre-empt state regulation.

*Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 368–69, 106 S.Ct. 1890, 1898, 90 L.Ed.2d 369 (1986) (citations omitted).

Section 2(b) of the Communications Act of 1934 precludes federal regulation of intrastate telecommunications service. That section provides in pertinent part:

Except as provided in section 224 of this title and subject to the provisions of section 301 of this title and subchapter V–A of this chapter, nothing in this chapter shall be construed to apply or to give the Commission jurisdiction with respect to (1) charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communication service by wire or radio of any carrier. . . .

47 U.S.C. § 152(b) (1978). In *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986), the Supreme Court considered the scope of section 152(b) in resolving a dispute between federal and state agencies concerning

methods of depreciation. Like Sprint, the FCC argued that states' refusal to accept FCC depreciation methods would frustrate the federal policy of increasing competition in the interstate telecommunications industry. In rejecting that argument, the court stated:

> In sum, given the breadth of the language of § 152(b), and the fact that it contains not only a substantive jurisdictional limitation on the FCC's power, but also a rule of statutory construction ... we decline to accept the narrow view urged by respondents, and hold instead that it denies the FCC the power to preempt state regulation of depreciation for intrastate ratemaking purposes.
>
> . . . .
>
> Accordingly, we cannot accept respondents' argument that § 152(b) does not control because the plant involved in this case is used interchangeably to provide both interstate and intrastate service, and that even if § 152(b) does reserve to the state commissions some authority over "certain aspects" of intrastate communication, it should be "confined to intrastate matters which are 'separable from and do not substantially affect' interstate communication."

*Id.* at 373, 106 S.Ct. at 1901 (citation omitted).

For these reasons, we conclude that federal law does not preempt the Commission's decision to impose a compensation requirement on Sprint.

### 2.

■ Sprint claims that imposing a compensation requirement on all common carriers except AT & T denies Sprint the equal protection of the law as guaranteed by the fourteenth amendment of the United States Constitution and article II, section 25 of the Colorado Constitution. We do not agree.

Equal protection of the law is a guarantee of like treatment for all those who are similarly situated. Any classification

of persons singled out for legislation must be reasonable and not arbitrary and must be based on substantial differences having a reasonable relation to the persons dealt with and the public purpose to be achieved.

*Dunbar v. Hoffman,* 171 Colo. 481, 484, 468 P.2d 742, 744 (1970) (citation omitted). Here Sprint is not situated similarly to AT & T. The Commission found that Feature Group C, available to AT & T, was capable of identifying, blocking, and diverting intraLATA calls to Mountain Bell's facilities, while Feature Group A did not possess such technical sophistication. Because of this, Sprint and other common carriers appeared to be incapable of preventing intraLATA leakage, while AT & T did not.[13] Nothing prevents the Commission from imposing a compensation requirement on AT & T in the future if it finds that AT & T's system is capable of intraLATA leakage, but in the absence of such a finding, we conclude that the Commission created a valid classification of carriers other than AT & T for the purpose of imposing a compensation requirement.

### IV.

The Commission recognized that imposing a compensation requirement on Sprint is a transitional strategy from the traditional doctrine of intrastate regulated monopoly to the modern doctrine of regulated competition in the Colorado interLATA telecommunications markets. We conclude that the Commission regularly pursued its authority in imposing a compensation requirement on Sprint as a condition of certification to compete in Colorado's interLATA telecommunications markets. The decision of the district court is affirmed.

---

**13.** The Commission has subsequently challenged the validity of its assumption that AT & T's system is incapable of intraLATA leakage. On June 24, 1986, the Commission on its own motion launched an investigation into the questions of intraLATA leakage and compensation, if any, that AT & T will be required to pay to local exchange carriers such as Mountain Bell. The results of that investigation are not before us.