The **MOUNTAIN STATES TELEPHONE AND TELEGRAPH COMPANY, a Colorado Corporation, Plaintiff–Appellant,**

v.

The **PUBLIC UTILITIES COMMISSION OF the STATE OF COLORADO and Edythe S. Miller, Andra Schmidt and Ronald L. Lehr, Defendants–Appellees,**

**and**

**Colorado Municipal League; Staff of the Colorado Public Utilities Commission; and Colorado Office of Consumer Counsel, Co–Defendants–Appellees.**

No. 86SA319.

Supreme Court of Colorado,
En Banc.

Oct. 31, 1988.

Rehearing Denied Nov. 28, 1988.

Coleman M. Connolly, Mary C. Snow, Kathryn Marie Krause, and Russell P. Rowe, Denver, for plaintiff-appellant.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Eugene C. Cavaliere, Deputy Atty. Gen., Mark A. Davidson, Asst. Atty. Gen., Denver, for defendants-appellees.

Dudley P. Spiller, Jr., Joseph B. Wilson, Gorsuch, Kirgis, Campbell, Walker and Grover, Denver, for the Colorado Mun. League.

Anthony Marquez, Asst. Atty. Gen., Denver, for Colorado Office of Consumer Counsel.

MULLARKEY, Justice.

Prior to January 1, 1984, the Mountain States Telephone and Telegraph Company (Mountain Bell) regularly published telephone directories, including White and Yellow Pages, for the use of its customers. Mountain Bell included the publishing assets in its base for ratemaking purposes. Mountain Bell's publishing revenues, particularly the profits from Yellow Pages advertising, were used to further the goal of universal telephone service by subsidizing rates charged to telephone customers. This case arose because, through a series of transactions in early 1984, Mountain Bell transferred its publishing assets to U.S. West Direct and entered into a three year contract with U.S. West Direct to publish directories for Mountain Bell's customers. In exchange for its publishing assets, Mountain Bell received stock which it

transferred to U.S. West, Inc. as a dividend. Both Mountain Bell and U.S. West Direct are subsidiaries of U.S. West, Inc., although Mountain Bell is a telephone company regulated by the Colorado Public Utilities Commission (PUC) and U.S. West Direct is not.

After the publishing assets were transferred, Mountain Bell petitioned the PUC on April 2, 1984 to authorize the transfer. The PUC allowed the Colorado Municipal League and the Colorado Office of Consumer Counsel to intervene in the matter. In its initial application, Mountain Bell valued the transferred publishing assets at $64.6 million including $56.3 million in cash to be used as working capital. During the pendency of the PUC proceedings, Mountain Bell filed an amended application to adjust the amount of cash transferred, stating that because the initial estimate was too high, U.S. West Direct had returned to Mountain Bell $16.9 million plus interest. U.S. West Direct was then a newly formed company which was capitalized, not by U.S. West, Inc., but by the Bell operating companies in this region including Mountain Bell.

The PUC found that the transfer of Mountain Bell's publishing assets to U.S. West Direct was contrary to the public interest and an abuse of management discretion. The PUC concluded that, as a result of the transfer of the publishing assets, Mountain Bell would suffer a net loss of $45.7 million over the three year term of its contract with U.S. West Direct and Mountain Bell's customers would lose an annual rate offset which the PUC valued at over $29 million.[1] The PUC ordered Mountain Bell to reacquire the publishing assets and to take the necessary steps at its own expense to resume its publishing operations in Colorado.

Mountain Bell appealed to the Denver District Court which stayed the PUC order pending appeal. The district court affirmed the PUC, and Mountain Bell now appeals to this court pursuant to section 40-6-115(5), 17 C.R.S. (1984). We also affirm.

In this request for judicial review, Mountain Bell advances a variety of theories to challenge the PUC's decision. These issues may be grouped as follows: (1) whether the PUC had jurisdiction over the transferred assets; (2) whether the PUC denied Mountain Bell a fair hearing; and (3) whether the remedy imposed by the PUC was an abuse of discretion or unconstitutional. We will consider each of Mountain Bell's contentions in turn.

## I.

Mountain Bell challenges the constitutional and statutory bases for the PUC's jurisdiction over the assets transfer. It contends that it was acting in a private business capacity when transferring the assets and that the assets transferred were outside the scope of the PUC's jurisdiction because they were not "essential" to public utility service. Even if a jurisdictional basis were found to exist for the PUC's order, Mountain Bell argues that it would be unconstitutional as applied to Mountain Bell's transfer of its publishing assets.

## A.

In support of its jurisdiction over this matter, the PUC relies on its broad authority derived from the Colorado Constitution which vests the commission with "all power to regulate the facilities, service and rates and charges therefor" of public utilities operating within the state of Colorado. Colo.Const. art. XXV. Because it is undisputed that Mountain Bell is a public utility as defined in section 40-1-103(1)(a), 17 C.R.S. (1984), the PUC asserts that it has specific jurisdiction over this matter under section 40-5-105, 17 C.R.S. (1984), which states:

---

**1.** The PUC's determination of the value of the rate offset from the Yellow Pages profits is consistent with corresponding figures given by state regulatory commissioners at congressional hearings in 1982. *See* MacAvoy and Robinson, *Losing By Judicial Policymaking: The First Year*

*of the AT & T Divestiture,* 2 Yale J. on Reg. 225, 234 n. 52 (1985) (listing figures for various states and noting that "Yellow Pages contributed $2 billion annually nationwide in revenues generally used to defray the joint and common costs of basic exchange service.").

The assets of any public utility, including any certificate of public convenience and necessity or rights obtained under any such certificate held, owned, or obtained by any public utility, may be sold, assigned, or leased as any other property other than in the normal course of business but only upon authorization by the commission and upon such terms and conditions as the commission may prescribe.

Mountain Bell's position on the PUC's jurisdiction has been inconsistent. Prior to the time when the PUC issued its decision, Mountain Bell repeatedly conceded that the PUC had jurisdiction over this matter. Mountain Bell originally acknowledged the necessity for PUC approval of the assets transfer in various documents including the board of directors' authorization of the transfer and the bill of conveyance which effectuated the transfer. Mountain Bell itself then invoked the jurisdiction of section 40–5–105 in both its initial application and its amended application requesting the PUC to approve the transfer of its publishing assets.

Before this court, Mountain Bell's legal analysis of the PUC's jurisdiction also has been flawed by inconsistency. On the one hand, Mountain Bell admits the PUC has jurisdiction when in its brief it assures us that the PUC may "look at the asset transfer ... to determine whether the ratepayer had any interest in the assets transferred and, if so, whether the ratepayer was adequately compensated." Yet, at the same time, Mountain Bell vigorously asserts that the PUC lacks jurisdiction over the assets transfer under either the constitution or section 40–5–105. Mountain Bell's position on jurisdiction is plainly contradictory because it concedes exactly what it is attacking. Mountain Bell fails to appreciate that jurisdiction is the power to act, not the correctness of the decision reached. *See Department of Revenue v. Borquez,* 751 P.2d 639, 641 (Colo.1988); *Hill v. District Court,* 134 Colo. 369, 373, 304 P.2d 888, 891 (1956). If the PUC may "look at" the assets transfer, it must have jurisdiction over the subject matter of the assets transfer.

Despite these concessions, Mountain Bell attacks the PUC's jurisdiction by raising two closely related arguments. First, it contends that it engaged in the directory publishing business in its private, proprietary capacity. It asserts that article XXV embodies the concept of regulated monopoly and, therefore, the constitution does not permit the PUC to regulate a public utility's *private* business ventures. Second, it claims that telephone directories are not essential to the utility service which it provides, i.e., telecommunications. It urges us to construe the phrase "assets of any public utility" in section 40–5–105 as limited to those assets which are "essential" to providing the utility service in question.

■ In interpreting the source of the PUC's jurisdiction in article XXV and section 40–5–105, we begin with the plain language of each. *Urbish v. Lamm,* 761 P.2d 756, 759 (Colo.1988); *Engelbrecht v. Hartford Accident & Indem. Co.,* 680 P.2d 231, 233 (Colo.1984); *People v. Howell,* 701 P.2d 131, 133 (Colo.Ct.App.1985). Neither the constitution nor the statute contains the limitations on the PUC's jurisdiction which Mountain Bell suggests. On the contrary, article XXV effectuates a broad delegation of legislative power to the PUC, vesting the commission with as much authority as the general assembly had prior to the adoption of article XXV in 1954. *Miller Brothers, Inc. v. Public Util. Comm'n,* 185 Colo. 414, 431, 525 P.2d 443, 451 (1974).

■ This is not a case in which we need to decide the outer contours of the PUC's inherent authority under article XXV, but it is clear, as the Municipal League points out, that the PUC's authority under article XXV is not narrowly confined but extends to incidental powers which are necessary to enable it to regulate public utilities. *See, e.g., Mountain States Tel. & Tel. Co. v. Public Util. Comm'n,* 195 Colo. 130, 576 P.2d 544 (1978) (PUC has authority to grant attorney fees to intervenors in ratemaking proceedings). By acknowledging that the PUC may "look at" the assets transfer in a rate case, Mountain Bell implicitly admits that the PUC has

**1026**

jurisdiction under its constitutional grant of authority. In our view, Mountain Bell has mischaracterized its argument as attacking the PUC's subject matter jurisdiction under article XXV, and we find that the PUC has jurisdiction under the constitutional article.

■ In this case, the PUC's jurisdiction stems not only from the constitution, but also from section 40–5–105 which expressly requires a public utility to obtain the authorization of the PUC prior to transferring its assets. The statute applies to assets transfers which are not in the ordinary course of business.[2] It is undisputed that the publishing assets were assets of Mountain Bell and we will not read into the statute the qualifying language proposed by Mountain Bell.[3] To take the position urged by Mountain Bell would restrict unreasonably the PUC's ability to oversee assets transfers and would place the PUC in the untenable position of relying on the truth of a utility's representation that the assets in question do not affect its provision of services or the rates charged to ratepayers. Our statutory scheme does not cast the PUC in such a restricted role. Section 40–5–105 requires the PUC to review any proposed transfer of public utility assets not done in the ordinary course of business and allows a transfer to proceed only if the PUC so authorizes and on the terms which the PUC may impose.

■ Mountain Bell claims the PUC's jurisdiction is limited only to actions taken by Mountain Bell in its public, not private, capacity. The public/private distinction which Mountain Bell urges was rejected by this court in another context in *City &*

*County of Denver v. Mountain States Tel. & Tel. Co.*, 754 P.2d 1172 (Colo.1988) (rejecting governmental/proprietary distinction in context of utilities relocation). In that case, we noted that the governmental/proprietary distinction did not provide a fair or predictable means of determining which functions were governmental and which were proprietary and we characterized the distinction as "analytically unsound." *Id.* at 1175. Adoption of Mountain Bell's proposed distinction between private and public functions with respect to utility assets likely would lead to the same difficulties.

Moreover, this case illustrates that the private business and public utility functions are not easily separated. Nor are the "essential" utility assets easily separated from the "non-essential." Historically, both the PUC and Mountain Bell considered the publishing assets to be public utilities assets. The assets were recorded in the regulated book of accounts and were depreciated according to PUC and Federal Communications Commission schedules. The depreciated assets were included in Mountain Bell's base for ratemaking purposes and the Yellow Pages revenues were used to subsidize rates for telephone customers. White and Yellow Pages were published as a single integrated product. A free alphanumeric listing was offered to residential customers in the White Pages and to business customers in the Yellow Pages, and a free copy of the directory was provided to all customers as part of Mountain Bell's service. The commission notes that Mountain Bell previously stipulated that directory service was "essential" to the provision

2. As an alternative argument, Mountain Bell claims that section 40–5–105 does not apply because the transfer was done "in the ordinary course of business," explaining that its board of directors approved the transfer in the regular exercise of its authority. This argument fails because the statutory exception for transfers done in the ordinary course of business is intended to exempt only routine transfers such as the purchase and sale of company vehicles. The size of the assets transferred (approximately $50 million) and Mountain Bell's initial treatment of the transfer as necessitating PUC authorization negate Mountain Bell's transparent attempt to avoid the reach of the statute by belat-

edly labelling the assets transfer as having been done "in the ordinary course of business."

3. In support of its proposition that the PUC lacks jurisdiction over the assets transfer, Mountain Bell cites *Mountain States Tel. & Tel. Co. v. Public Serv. Comm'n*, 745 P.2d 563 (Wyo.1987) in which the Wyoming Supreme Court ruled that the Public Service Commission had no *statutory* authority over the transfer of Mountain Bell's publishing assets. That decision, however, was based on the Wyoming statute which has no counterpart to Colorado's section 40–5–105.

of telephone service. *Corporation Comm'n v. Mountain States Tel. & Tel. Co.,* 84 N.M. 298, 502 P.2d 401 (1972), *overruled on other grounds, Matter of Rates and Charges of Mountain States Tel. & Tel. Co.,* 99 N.M. 1, 653 P.2d 501, 504–505 (1982). A telephone directory "has been called an indispensable element of telephone service." Annotation, *Liability of Telephone Company for Mistakes in or Omissions from Its Directory,* 47 A.L.R.4th 882, 897 (1986).

To support its present contention that its publishing operation is a private business, Mountain Bell relies on *University Hills Beauty Academy, Inc. v. Mountain States Tel. & Tel. Co.,* 38 Colo.App. 194, 554 P.2d 723 (1976). In that case, a company which purchased a classified advertisement in the Yellow Pages sued Mountain Bell for negligently placing the advertisement under the wrong heading. The court of appeals upheld a provision in the contract between Mountain Bell and the advertiser which limited Mountain Bell's liability in that situation. In its opinion, the court of appeals stated that Mountain Bell acted in its private capacity when it entered into the contract.

In the context of limitation of liability clauses in Yellow Pages advertising, other courts have construed Yellow Pages advertising as a matter of private contract. *See, e.g., State ex rel. Mountain States Tel. & Tel. Co. v. District Court,* 160 Mont. 443, 503 P.2d 526 (1972). *But see State ex rel. Util. Comm'n v. Southern Bell Tel. & Tel. Co.,* 307 N.C. 541, 299 S.E.2d 763 (1983) (overruling *Gas House, Inc. v. Southern Bell Tel. & Tel. Co.,* 289 N.C. 175, 221 S.E.2d 499 (1976)); *Discount Fabric House v. Wisconsin Tel. Co.,* 117 Wis.2d 587, 345 N.W.2d 417 (1984) (expressly refusing to follow *University Hills*). *See also* Annotation, *Liability of Telephone Company for Mistakes in or Omissions from Its Directory,* 47 A.L.R.4th 882, 897–99 (1986) (Yellow Pages listings have been held to be a matter of private contract, but White Pages listings generally are considered part of telephone company's public service function and thus subject to state regulation).

The court of appeals in *University Hills,* of course, was not confronted with the issue now before us. Every aspect of a public utility's operations has never been deemed subject to the approval of the PUC. The PUC *regulates* public utilities, it does not *operate* them. Indeed, the statute now before us for construction, section 40–5–105, only requires advance PUC approval of the transfer of assets in other than the normal course of business. *See* discussion at p. 1026 *supra* and note 2. The fact that the PUC does not regulate contracts between Mountain Bell and its classified advertisers in no way diminishes the PUC's power to regulate Mountain Bell's publishing business, especially when, as here, the PUC is given an express statutory duty to act.

For these reasons, we conclude that the commission had jurisdiction over this matter pursuant to both article XXV and section 40–5–105.

### B.

■ Mountain Bell next contends that, if the PUC has jurisdiction over the transfer of its publishing assets under article XXV and section 40–5–105, then both provisions are unconstitutional under the United States Constitution because they permit an unconstitutional taking of its private property. Mountain Bell argues that the publishing assets belong to its shareholders who took the risks to develop the publishing business. As discussed above, we reject Mountain Bell's characterization of its publishing operations as purely private. The directory publishing business was developed over the past fifty years within the protective shelter of Mountain Bell's monopoly of telephone service. The assets were included in the base upon which Mountain Bell was permitted to earn a return. Mountain Bell concedes that the Yellow Pages always have generated "supra competitive" profits. *See also United States v. American Tel. & Tel. Co.,* 552 F.Supp. 131, 193 (D.D.C.1982), *aff'd sub nom. Maryland v. United States,* 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983).

It is an exaggeration to say that Mountain Bell's shareholders took any significant risk in developing the directory publishing business, and we find the public interest in those assets to be beyond dispute. Thus, we conclude that neither article XXV nor section 40–5–105 accomplishes an unconstitutional taking.

## II.

We next consider Mountain Bell's claims of procedural due process violations based on alleged bias on the part of a PUC commissioner and a lack of ascertainable standards by which the case was judged.

## A.

■ Mountain Bell argues that it did not receive a fair hearing because of the bias of one of the commissioners who had allegedly prejudged the case. PUC Commissioner Edythe Miller on September 9, 1984 made a statement in an affidavit filed in district court in a related proceeding [4] that "the Colorado ratepayer is harmed since assets previously used to subsidize telephone rates have been diminished." Several months later, Miller was one of the three commissioners who presided over the PUC hearings and issued the final decision. Mountain Bell argues that Miller pre-determined the effect of the assets transfer and thus was unable to serve in a proper unbiased quasi-judicial capacity as a commissioner. We disagree.

The statutory procedures for disqualification of an administrative adjudicator are set forth in the Administrative Procedure Act, section 24–4–105(3), 10A C.R.S. (1988). Mountain Bell made no attempt to follow these procedures. Instead, Mountain Bell waited approximately nine months to raise the question of disqualification and then did so only after the PUC had made its decision. By delaying and failing to follow the proper procedures, Mountain Bell made a tactical choice and waived whatever objection it may have had to Commissioner

Miller's participation in this case. *See McClellan v. State Dep't of Revenue*, 731 P.2d 769, 771 (Colo.Ct.App.1986) (failure to raise issue of bias in administrative hearing under section 24–4–105(3) waives objection).

■ Moreover, there is a presumption of integrity, honesty, and impartiality in favor of those serving in quasi-judicial capacities. *Soon Yee Scott v. City of Englewood*, 672 P.2d 225 (Colo.Ct.App.1983) (quoting *Withrow v. Larkin*, 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975)). An adjudicatory hearing will be held to have been conducted impartially in the absence of a personal, financial, or official stake in the decision evidencing a conflict of interest on the part of a decision maker. *Soon Yee Scott*, 672 P.2d at 228. A decision maker is not disqualified on due process grounds simply for having taken a position, even in public, on a policy issue related to the dispute, if there is no showing that the decision maker is incapable of judging the particular controversy fairly on the basis of its own circumstances. *Hortonville Joint School Dist. No. 1 v. Hortonville Educ. Assoc.*, 426 U.S. 482, 494, 96 S.Ct. 2308, 2315, 49 L.Ed.2d 1 (1976) (quoting *United States v. Morgan*, 313 U.S. 409, 421, 61 S.Ct. 999, 1004, 85 L.Ed. 1429 (1941)). Without more, the commissioner's filing of the affidavit is insufficient to rebut the presumption of impartiality, and thus does not cast an unconstitutional taint on the proceedings.

■ In addition, we note that a decision maker may have a dual role as a witness at one step of the proceedings and as a member of a reviewing body at a later stage of the same proceedings. *Leonard v. Board of Dir.*, 673 P.2d 1019 (Colo.Ct.App.1983). *See also* §§ 40–6–109(2), & –111(1)(a), 17 C.R.S. (1984) (PUC and individual commissioners may hear matters raised on own motion or in which commissioner conducted prior hearing as examiner). Mountain Bell's procedural due process rights were

---

**4.** Commissioner Miller filed the affidavit in an action which eventually reached this court in *People ex rel. Woodard v. Mountain States Tel. & Tel. Co.*, 739 P.2d 850 (Colo.1987). In that case,

we dismissed the appeal because the district court's initial ruling regarding the assets transfer was not a final judgment under C.R.C.P. 54(b).

not infringed upon by Commissioner Miller's participation in this case.

### B.

Mountain Bell further claims it was denied a fair hearing due to a lack of specific standards governing the PUC's rejection of its application. It alleges that the standards announced by the PUC, namely that the transfer would be approved only if it were in the "public interest," violate due process by failing to inform it of the guidelines by which it would be judged. Mountain Bell claims that the "public interest" standard is no better than the legislative guideline of "public safety" which was found to be constitutionally inadequate in *Elizondo v. Colorado Dep't of Revenue*, 194 Colo. 113, 570 P.2d 518 (1977).

■ In our view, title 40, articles 3 and 4 of the public utilities law, 17 C.R.S. (1984), provide sufficient general standards for guidance relative to the application of section 40–5–105. The setting of guidelines for utility regulation is within the sole province of the PUC. *Miller Brothers*, 185 Colo. at 435, 525 P.2d at 454. The PUC has long emphasized and utilized the criterion of "public interest." *See, e.g., Morey v. Public Util. Comm'n*, 629 P.2d 1061, 1065 (Colo.1981); *Miller Brothers*, 185 Colo. at 432, 525 P.2d at 452; *Buckingham v. Public Util. Comm'n*, 180 Colo. 267, 271, 504 P.2d 677, 679 (1972) (the transfer of a motor vehicle carrier business will not be approved by the PUC if it is contrary to the "public interest").

■ As demonstrated within the context of past commission decisions, the term "public interest" involves a balancing of the interests of the shareholders in a reasonable rate of return and the rights of the ratepayers to receive adequate service at a price which reflects the cost of service. *Public Serv. Co. v. Public Util. Comm'n*, 644 P.2d 933 (Colo.1982). In *Miller Brothers* this court addressed a similar argument concerning the adequacy of guidelines when the petitioner argued that the commission had failed to articulate and apply "standards or criteria" regarding the doctrine of regulated competition. We rejected this argument, holding that guidelines for the commission's decision were "perfectly plain and understandable" and could be found through examination of other decisions of the commission. *Miller Brothers*, 185 Colo. at 431, 525 P.2d at 451. For these reasons, Mountain Bell cannot claim that it was unaware of the standards set by the commission or that these standards were unconstitutionally vague.

### III.

Mountain Bell attacks the remedy imposed by the PUC[5] on three separate grounds. First it argues that the PUC's decision was an abuse of discretion by the PUC and outside the scope of the PUC's authority. Second, it claims that the remedy selected is inappropriate in light of the changed conditions caused by the telephone industry deregulation. Finally, it contends the remedy selected is constitutionally infirm as a violation of the commerce clause and equal protection.

### A.

Mountain Bell claims that the remedy of undoing the assets transfer was outside the scope of the PUC's authority and an abuse of the PUC's discretion. It argues that the remedy was selected without soliciting evidence of the impact this decision could have on ratepayers and shareholders. Mountain Bell urges that imputation of revenues, which it describes as a common regulatory tool, is a preferable or superior approach because it would have a less adverse effect on Mountain Bell's financial standing while its effect on ratepayers would approximate the remedy of undoing the assets transfer. Under imputation of revenues, U.S. West Direct would not re-

---

5. In denying Mountain Bell's application for approval of the assets transfer the commission ordered Mountain Bell to develop a plan for the reacquisition of directory publishing assets, to resume directory publishing operations in Colo-rado, and to keep an accounting of all expenses incurred in complying with these directives to ensure that these changes take place at its own expense and not that of the ratepayer.

transfer the assets to Mountain Bell, but the directory publishing revenues of U.S. West Direct's Colorado operations would be imputed to Mountain Bell for ratemaking purposes.

We first note that any consideration given to Mountain Bell's strongly stated objections to the remedy devised by the PUC must be tempered by the fact that it elected to proceed with the assets transfer without securing prior PUC approval. We must presume that Mountain Bell acted with full awareness of the risks of violating section 40–5–105.

We reject Mountain Bell's objection to the remedy imposed for two reasons. First, the PUC has the authority to order an appropriate remedy by virtue of its statutory duty to administer and enforce the public utilities law. § 40–7–101, 17 C.R.S. (1984). *Denver Welfare Rights Organ. v. Public Util. Comm'n*, 190 Colo. 329, 335, 547 P.2d 239, 244 (1976). The legislature expected and, indeed, directed substantial PUC involvement in the transfer of utility assets because section 40–5–105 itself permits an assets transfer only on such terms and conditions as are prescribed by the PUC. Pursuant to section 40–3–102, 17 C.R.S. (1984), the PUC is vested with the power to regulate rates of public utilities and to correct abuses by doing all things which are necessary or convenient to the exercise of its regulatory authority. *GTE Sprint Communications Corp. v. Public Util. Comm'n*, 753 P.2d 212, 217 (Colo.1988). This statutory mandate necessarily includes the power to fashion an appropriate remedy to correct a violation of section 40–5–105, including ordering the reacquisition of assets.

Secondly, in view of the commission's special expertise in public utility regulation, we give great deference to the

PUC in its selection of an appropriate remedy.[6] *G & G Trucking Co., Inc. v. Public Util. Comm'n*, 745 P.2d 211, 216 (Colo. 1987); *Acme Delivery Serv., Inc. v. Cargo Freight Systems, Inc.*, 704 P.2d 839, 843 (Colo.1985). The PUC's findings are presumed to be valid and must be viewed in the light most favorable to the commission's decisions. *Colorado Office of Consumer Counsel v. Public Util. Comm'n*, 752 P.2d 1049, 1055 (Colo.1988) (quoting *Home Builders Ass'n v. Public Util. Comm'n*, 720 P.2d 552, 560 (Colo.1986)). Further, the orders of the commission are presumed to be reasonable and valid. *Caldwell v. Public Util. Comm'n*, 200 Colo. 134, 137, 613 P.2d 328, 330 (1980). It is well established that "[o]nly in the rarest cases, limited primarily to demonstrated recalcitrance by the agency, should a court attempt to substitute its remedy for that of the agency." 2 C. Koch, *Administrative Law and Practice* § 8.7, at 14 (1985).

The record shows that the PUC considered and rejected the imputation of revenues as a possible remedy. The PUC found that it was difficult to calculate the amount of imputation and that, over time, imputation causes erosion of the cost of capital and presents the danger of the necessity of a rate increase and a neglect of current needs and maintenance requirements.

In challenging the PUC's choice of remedy, Mountain Bell's brief cites to no evidence in the record which would support imputation of revenues as an appropriate or superior remedy. Our review of the record has disclosed no evidence presented by Mountain Bell on imputation of revenues.[7] Mountain Bell was the moving party in these proceedings, seeking to obtain the PUC's authorization for the transfer of its publishing assets. As the proponent of

---

6. We note that the same remedy of retransferring publishing assets was imposed by the Minnesota Public Utilities Commission on Northwestern Bell after the commission determined the transfer was not in the public interest. *Matter of the Application of Northwestern Bell Tel. Co.*, 367 N.W.2d 655 (Minn.Ct.App. 1985). (The commission's ruling in that case was subsequently overturned on other grounds.)

7. We note that, in a subsequent ratemaking case involving the identical directory publishing assets, Mountain Bell argued *against* the imputation of revenues on the grounds that Mountain Bell was appropriately compensated by the payments of the publishing fee by U.S. West Direct. *See Re Mountain States Tel. & Tel. Co.*, 74 P.U. R.4th 724, 734 (Colo.P.U.C.1986).

the order, it had the burden of proof. § 24–4–105(7), 10A C.R.S. (1988). *See Colorado Mun. League v. Mountain States Tel. & Tel. Co.*, 759 P.2d 40 (Colo.1988); *Orsinger Outdoor Advertising, Inc. v. Dep't of Highways*, 752 P.2d 55 (Colo.1988).

■ Here, Mountain Bell proceeded with the assets transfer without obtaining the advance PUC authorization required by section 40–5–105 and then it failed to carry its burden to prove that the transfer should be authorized retroactively. If Mountain Bell intended to advocate that a particular remedy was necessary or desirable to rectify its failure to comply with the law, the burden was on it to prove that fact before the PUC. Having failed to do so, Mountain Bell cannot object now to the remedy fashioned by the PUC.

In sum, the PUC acted within its statutory authority, and the record supports the PUC's selection of the remedy. Thus we will not set it aside as an abuse of discretion.

### B.

■ Mountain Bell also contends the remedy imposed by the PUC is inappropriate in light of the changed conditions caused by the divestiture of American Telephone and Telegraph Company (AT & T). *See* the decree in the anti-trust action allowing unregulated competition in the area of Yellow Pages directory publishing, *United States v. American Tel. & Tel. Co.*, 552 F.Supp. 131 (D.D.C.1982), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983); and its sequel, *United States v. Western Elec. Co., Inc.*, 592 F.Supp. 846 (D.D.C. 1984). Mountain Bell emphasizes the competition in the publishing of classified advertising directories and argues that its publishing business should be freed from PUC regulation so that it can compete. It also observes that the PUC has not sought to regulate Mountain Bell's business dealings with the publishers of alternative Yellow Pages. The PUC rejected this argument on the basis that Mountain Bell's (or U.S. West Direct's) Yellow Pages so dominate the market that there is no effective competition. From this it reasoned that the public interest required continued regulation of Mountain Bell's publishing assets.

We do not doubt that divestiture has had a profound impact on the telecommunications industry. *See generally GTE Sprint*, 753 P.2d at 213–15. However, the changing circumstances accompanying deregulation merely heighten the importance of the PUC's role in overseeing rate increases and underscore the wisdom of section 40–5–105's requirement that the PUC approve the transfer of a public utility's assets. With its expertise, the PUC is in the best position to assess the impact of an assets transfer on a utility's cost of capital and its ability to do business. *Acme Delivery Serv., Inc. v. Cargo Freight Systems, Inc.*, 704 P.2d 839, 843 (Colo.1985) (commission has special expertise in matter of public utility regulation and this expertise is entitled to substantial deference on judicial review). The PUC is able to determine how the transfer affects ratepayers as to the cost and quality of service and to determine whether the transfer should be authorized.

At oral argument, Mountain Bell informed the court that the company transferred its publishing assets for its convenience and to avoid exposure to future antitrust liability. Company convenience plainly cannot override the public interest and Mountain Bell has failed to show any imminent or probable antitrust violation resulting from its continued publication of telephone directories.

In the AT & T divestiture case, *United States v. American Tel. & Tel. Co.*, 552 F.Supp. 131, the court rejected a proposal that directory publishing assets should be transferred from the Bell operating companies such as Mountain Bell to AT & T. The court determined that the assets should remain with the operating companies, in part because profits from Yellow Pages revenues were used to subsidize rates charged to local telephone customers as a means of furthering the goal of universal telephone service. *United States v. American Tel. & Tel. Co.*, 552 F.Supp. at 194. Indeed, as many as thirty states use Yellow Pages profits for this purpose. *State ex*

*rel. Util. Comm'n v. Southern Bell Tel. & Tel. Co.*, 307 N.C. 541, 299 S.E.2d 763, 765 (1983). When the divestiture court again addressed this issue in 1984, it observed with dismay that the intent of its 1982 order had been circumvented by the acts of regional holding companies (such as U.S. West, Inc.) transferring publishing assets from the local operating companies to unregulated subsidiaries. *United States v. Western Elec. Co., Inc.*, 592 F.Supp. at 866. Thus, while we do not attempt to read the future regarding antitrust development, the present state of the law provides no justification for concluding that the transfer of Mountain Bell's publishing assets was necessary to avoid antitrust liability.

### C.

 Lastly, Mountain Bell raises two constitutional challenges to the PUC order, both of which we reject. First Mountain Bell argues that the PUC order violates the commerce clause of the United States Constitution because it results in impermissible protectionism of local ratepayers at the expense of non-resident consumers. Mountain Bell points out that its publishing operation included directories for an area encompassing several states, and because Mountain Bell may receive conflicting rulings from the various states, it suggests that the PUC's order in this case interferes with interstate commerce.

It is unclear how the retransfer of directory publishing assets to Mountain Bell's Colorado operations poses any burdens whatsoever on interstate commerce and out-of-state ratepayers. Mountain Bell urges us to reach a result similar to the one in *Brown–Forman Distillers Corp. v. New York State Liquor Authority*, 476 U.S. 573, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986), in which the United States Supreme Court struck down a state liquor regulation as violative of the commerce clause. In *Brown–Forman*, however, the acts of a state regulatory commission directly set the price of products in another state. The case now before us does not involve a transfer or sale across state lines, or price-fixing outside the state of Colorado. Re-

turning a portion of the assets which were largely cash from U.S. West Direct, located in Aurora, to Mountain Bell, located in Denver, does not implicate the commerce clause. If anything, the PUC order represents an effort to restore the status quo, as opposed to the imposition of some new burden on interstate commerce.

 Even if a burden on interstate commerce were found to result from this entirely intrastate operation (a proposition for which little, if any, support is found in the record), the commerce clause would not invalidate the PUC's action. Under the applicable commerce clause test, a state regulation which only indirectly affects interstate commerce will be upheld if it regulates even-handedly to effectuate a legitimate local public interest, and does not impose a burden on commerce which is clearly excessive. *Brown–Forman Distillers*, 476 U.S. at 575, 106 S.Ct. at 2082; *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 143, 90 S.Ct. 844, 848, 25 L.Ed.2d 174 (1970). The state's power to regulate commerce is especially great in matters traditionally of local concern. *Kassel v. Consolidated Freightways Corp.*, 450 U.S. 662, 671, 101 S.Ct. 1309, 1316, 67 L.Ed.2d 580 (1981) (citing *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 350, 97 S.Ct. 2434, 2445, 53 L.Ed.2d 383 (1977)). Regulation of intrastate phone service constitutes a legitimate state interest of traditional local concern, and is an area which Congress has expressly delegated regulatory authority to the states. *See Louisiana Public Serv. Comm'n v. Federal Communications Comm'n*, 476 U.S. 355, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986).

 Mountain Bell next claims its equal protection rights are violated because it is being treated differently from similar publishing businesses which are non-regulated. We are not persuaded. Because the publishing assets were public utility assets, Mountain Bell was treated no differently from other public utilities which are regulated by the PUC, and thus equal protection is not implicated. Even if an equal protection analysis were applied, economic regulations such as the PUC's actions here

are reviewed under the "rational basis" test to determine whether the state action is rationally related to a legitimate state purpose. *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 465, 101 S.Ct. 715, 724, 66 L.Ed.2d 659 (1981); *City of Montrose v. Public Util. Comm'n*, 732 P.2d 1181, 1189 (Colo.1987). The PUC order easily withstands scrutiny under this test as being rationally related to the legitimate state interest of protecting ratepayers.

### IV.

In summary, we hold that the PUC had jurisdiction over the transfer of publishing assets by Mountain Bell by virtue of its constitutional and statutory grant of authority. Mountain Bell received a fair hearing before the PUC and its procedural due process rights were not violated. Finally, the remedy imposed by the PUC was not an abuse of discretion or unconstitutional.

Accordingly, we affirm the judgment of the district court.

KIRSHBAUM, J., does not participate.